## WHITE v. WOODMEN OF THE WORLD.

No. 5617.   Decided October 21, 1935.   (50 P. [2d] 422.)

Petition for Rehearing Denied January 16, 1936.

478

*E. A. Walton* and *Walter C. Hurd*, both of Salt Lake City, for appellant.

*Dan B. Shields*, of Salt Lake City, and *John L. Schweigert*, of Denver, Colo., for respondent.

FOLLAND, Justice.

By this action the plaintiff, Lucy White, seeks to recover the value of a death benefit certificate issued by the defendant, a fraternal benefit association, to her deceased husband, Ernest C. White, who died September 29, 1932. In

her complaint she alleged payment by the deceased of all lawful premiums, dues, and assessments levied and charged against him as required by his contract of insurance and by the constitution and laws of the defendant; that the defendant had levied unlawful and wrongful assessments, carrying higher rates, and if the amount paid by the deceased were insufficient to carry him until the time of death, his failure to pay a greater amount was wholly due to the wrongful act of the defendant in demanding and trying to exact an illegal and greater amount than was due; and that defendant is estopped from claiming the said deceased should have paid more during his lifetime. The defendant in a lengthy answer, wherein it set up in detail the circumstances and conditions of its affairs and the change of policy made necessary thereby, admitted that Ernest C. White was a member of defendant association and had issued to him certificate No. 48004 by the terms of which the association agreed to pay his beneficiary the sum of $3,000 on his death, which payment it alleged was conditioned wholly and entirely on full compliance on the part of the insured with the terms and conditions of the certificate, application for membership, constitution, and by-laws, rules, and regulations of the subordinate camp or lodge, and by payment of the stipulated dues and assessments. That in the year 1929, White became delinquent and was suspended from membership and at no time thereafter, notwithstanding repeated opportunities afforded him, did he ever reinstate his membership. After a trial before a jury and at the close of all the evidence, plaintiff and defendant each moved the court for a directed verdict. The plaintiff in her motion announced that if her motion be denied, she still asked to go to the jury on all issues of fact with certain stated exception. The court granted defendant's motion and directed a verdict of no cause of action.

To better afford an understanding of the issues, a more detailed statement of facts is necessary. The defendant corporation is a fraternal benefit society, or association, not

for profit, organized under and by virtue of the statutes of the state of Colorado, authorized to do business and doing business continuously since January 20, 1891, in the nine western states of Colorado, California, Oregon, Washington, Utah, Idaho, Montana, Wyoming, and Nevada. By its articles of incorporation, the association has at all times expressly reserved the right to "alter, modify, or change the constitution, by-laws, rules and regulations at will." It has a representative form of government with supreme authority vested in and exercised by a representative body known as the Head Camp Session. A major purpose of the association is the payment of death benefits to beneficiaries of deceased members through monthly assessment dues, single or multiple, as experience requires, called from and payable by its members.

During the earlier years of its existence, the association was able to meet its monthly obligations and to accumulate a substantial surplus fund. During these years its membership consisted mainly of men in the lower brackets of age. The assessment system did not require the setting up of reserves, as that term is understood in life insurance parlance, since death claims were paid out of the monthly assessments which would be single or multiple, dependent upon the number of death claims payable each month. As time passed, the average age of the membership became higher, resulting in a higher rate of mortality. The surplus which had been accumulated began to diminish. By 1928, the association had reached a crisis when it had a certificate liability of $220,000,000 with a fund of only $9,000,000 on hand. The insurance commissioners of the states in which the defendant operates met in special conference and by resolution required the association to readjust its rates upon adequate approved and standard bases of life insurance operation, otherwise the association would not be permitted to continue doing business. In an effort to meet the demands of the insurance commissioners, the regular Head Camp Session of defendant held at Oakland, Cal., in June

of 1928, undertook to adopt appropriate amendments to its constitution and by-laws to place the organization on a financially sound basis. These amendments provided a new plan, which included the creation of what was termed a "Reserve Division," effective on and after September 1, 1928. Steps were then taken by personal solicitation to have the members change their benefit certificates under the assessment plan to the new certificates in the Reserve Division. This they were permitted to do without medical examination, but upon payment of increased rates, under the American Experience Tables of Mortality, applicable to their attained ages. Exchange was not compulsory, but those members who failed or refused to effect an exchange of the old certificates for the new were permitted to continue under the assessment plan and would be required to pay sufficient extra or multiple assessments from month to month to meet the death claims arising among them. That is, the membership was divided into two classes, those in the Reserve Division paying a higher fixed rate and those retaining the old certificates still subject to the assessment plan. The husband of plaintiff refused to exchange his certificate and chose to remain in the second group. He paid the regular single assessments to and including June of 1929, but failed to pay certain multiple assessments levied in May and June. He tendered payment of merely the regular single assessment for July or August of 1929, which tender was refused. No other assessments were paid by him or on his behalf up to the date of his death in September, 1932, a period of more than three years, although both single and multiple assessments had been levied. He thereupon stood suspended from membership for failure to pay dues and assessments.

The business of exchange was actively prosecuted resulting in many thousands of members accepting new certificates on surrender of the old, when in May, 1929, a suit in equity was filed in the district court in and for the City and County of Denver, Colo., by eight members of the associa-

tion, entitled *"John J. McCue et al.* v. *Woodmen of the World et al."* The defendants were the defendant association in this case and the head officers of such association. By this suit it was sought to have the amendments creating the Reserve Division declared invalid and the officers enjoined from levying extra or multiple assessments against those who had failed or refused to make the change to the Reserve Division. After a trial, the district court declared the amendments objected to had not been legally adopted and entered an injunctive decree against defendants. An appeal was taken to the Supreme Court of that state, which court limited its consideration to two questions only: (1) Did plaintiffs have capacity to sue? and (2) Were the amendments legally adopted? The first question was answered in the affirmative and the second in the negative. *Woodmen of the World* v. *McCue,* 88 Colo. 209, 294 P. 947, 954. The constitution of the association provided that the constitution and by-laws may be amended by "two-thirds of the votes of any regular or special Head Camp Session." The vote taken in the Oakland Head Camp Session in 1928 was merely viva voce and not by roll call. The record failed to show that two-thirds of the votes were cast for the amendment. Because of this condition of the record, the court held the constitutional requirement of a two-thirds vote had not been complied with and the amendments had not been legally adopted. The court said:

"The decree of the district court, in effect, left the Woodmen of the World, and its membership in the same condition and with the same rights and duties as though no amendment had been attempted. Only in so far as this decree effectuates this purpose, it is affirmed."

Promptly after such decision, a special Head Camp Session was called and held January 12 to 16, 1931, at Denver, Colo., at which the identical legislation acted on in 1928 was presented and adopted by legal vote. A curative or retrospective provision was adopted making the new plan effective on and after September 1, 1928. Certain option and

privilege provisions were also made applicable to default members of the society who had been members prior to September 1, 1928, but who had failed or refused to pay the extra or multiple assessments. Such suspended members were recognized as entitled to retain membership in the association by acceptance of one of four options which were thereupon extended to them. These options were available to Ernest C. White. By such options, had he exercised either of them, he was required (1) to pay henceforth the increased rate fixed, thus continuing in force his $3,000 certificate by monthly payments of $29.55; or (2) he could elect to exchange his $3,000 certificate for a new one of the same face value issued upon a rate under the American Experience Table of Mortality at $32.65 a month; or (3) he could elect to continue his old monthly payments of $3.40 for benefits reduced to $848; or (4) he could continue his monthly payments of $3.40 under his $3,000 certificate with an interest-bearing lien or loan impressed thereon for the deficiency to recover the inadequacy of such rate. The accumulated fund or so-called surplus was allocated between the two classes of membership to be used in the reduction of monthly payments by the old members. That is, if White had elected to pay the increased rates under either the old or the new certificate, his monthly payments would have been reduced by $4.95 each month so long as he continued to make such payments. This surplus fund was not to be distributed among the members, but to be held as reserve with credit allocated as above set forth.

The nature of the relationship between the deceased member and the defendant must be understood in order to have a clear notion of the law applicable to the case. Such relationship is well expressed by Mr. Justice Holmes in the case of *Supreme Lodge, K. P.,* v. *Mims,* 241 U. S. 574, at page 580, 36 S. Ct. 702, 704, 60 L. Ed. 1179, L. R. A. 1916F, 919:

"Persons who join institutions of this sort are not dealing at arm's length with a stranger whose mode of providing for payment does not

concern them, but only his promise to pay. They are joining a club the members of which have to pay any benefit that any member can receive. The corporation is simply the machine for collection and distribution. * * * The essence of the arrangement was that the members took the risk of events, and if the assessments levied at a certain time were insufficient to pay a benefit of a certain amount, whether from diminution of members or any other cause, either they must pay more or the beneficiary take less. * * *

"In determining his rights it is important to bear in mind that there was no specific promise to him, like the promise to pay, in the certificate, but that his whole reliance is upon a law of the corporation; and that he had notice that all laws of the corporation were liable to be repealed. The only language in the certificate bearing on the matter pointed to possible changes, one condition being the payment of all monthly payments 'as required.' It was obvious and understood that, to pay a benefit, an increase in the assessment might be necessary."

Other cases are to the same effect. *Jenkins* v. *Talbot*, 338 Ill. 441, 170 N. E. 735, 80 A. L. R. 638, and annotations.

The matter in controversy may be reduced to two or three issues. Plaintiff sued on the theory that her husband was at the time of death a member of the association in good standing and that she is entitled to the death benefits under his certificate. The defendant resisted on the ground that the deceased was not a member at the time of death because of failure to pay assessments and that he had been suspended for such failure and his failure to become reinstated by exercising any one of the four options extended to him on or before May 31, 1931, and, as a consequence, plaintiff is not entitled to recover. White paid no dues or assessments for a period of more than three years before his death and, obviously, he was not a member in good standing at the time of death unless for some reason he may be excused for such failure or the association is estopped from asserting that he was not a member. The evidence indicates he definitely refused to pay any of the extra or multiple assessments although he did pay up to June, 1929, the regular single assessment and tendered the single assessment for July or August. He was not obliged to continue his tender

of the single assessments because the association definitely refused to accept them unless accompanied by the extra assessments. The result of the litigation in Colorado would seem to be that the extra or multiple assessments levied under the 1928 legislation were ineffective and void and therefore, notwithstanding his failure to pay the same, he continued as such member and was entitled to the privileges of membership, at least up to January 1, 1931, at which time the new legislation was legally adopted and made effective dating back to September 1, 1928. At this time the privilege of reinstatement under one of the plans proposed in the four options was left open until May 31, 1931. White did not exercise either of the options and, consequently, forfeited his membership in the association, unless it can be said, as is argued by plaintiff, that the defendant owed him a duty of personal notice of the options extended to him. We shall discuss this phase of the case later.

The plaintiff has urged that the defendant had no right to change, by purported amendments to its laws, the essential contract between White and the association, and that White performed his whole duty by payment of the regular assessments and tender to further pay such assessments, and that the association wrongfully demanded and attempted to exact an illegal or greater amount than was due. Any question with respect to the right of the association to amend its laws resulting in increased or higher rates and a new or different plan may be shortly disposed of. By joining the association, White agreed to be bound not only by the provisions of the certificate, but by the existing provisions of the constitution and by-laws and also by any changes made in such laws thereafter. The cases teach that he was bound by any change thereafter made which was not arbitrary or unreasonable. Since the case in hand was argued and submitted, the Supreme Court of Colorado, the home state of defendant, gave its decision in the case of *Woodmen of the World* v. *Lamson*, 47 P. (2d) 339, where the question decided was that extra assessments (the

same assessments involved in this case) may be levied upon its members by the Woodmen organization. In that case the court said:

"Under the better doctrine of the leading cases the Woodmen organization has the power under the statute of this state, under which it was organized, and by its rules and regulations thereunder, to levy these extra assessments if it finds it to be necessary to increase the rates as fixed in the original contract between the society and its members, provided, of course, such assessments are not arbitrary and unreasonable, but only sufficient in amount to enable the society to continue its business and carry out the purpose for which it was organized."

The leading cases supporting this doctrine are quoted from and cited in the Lamson Case and need not be repeated here.

The record discloses that the association found itself in serious financial difficulty. When the insurance commissioners of the nine states wherein the defendant did business were at the point of denying to the association the right of continuing in business unless it was placed in a solvent condition, an increase in rates and a change in policy were inevitable. There is no showing that the charges made were unnecessary, arbitrary, or unreasonable. The new plan was in harmony with the suggestions made by the insurance commissioners and was intended to place the association in a position where it could continue its existence on a sound financial basis. The decision of the court of the domicile of defendant corporation is decisive on the question of its power to levy the multiple assessments therein passed on.

Counsel next argue that the assured's interest in the reserve or surplus funds of the association would carry substantial insurance, and if the association changed its plan, the assured was entitled in the way of insurance or cash to the benefit of such surplus. In support of this contention, plaintiff refers to the fact that if White had elected to make payment of the inreased rates

under either plan, the association would have allowed a monthly credit of $4.95 on account of such accumulated surplus. The fallacy of this argument is that a member does not acquire any severable or proprietary right to any portion of the property of the organization as against the association itself. 19 R. C. L. 1267. The property was subject to disposal by the association in accordance with its own laws and the law of the state. White could have obtained a proportional benefit from such accumulated fund had he chosen to remain a member and pay increased rates under either the old or new plan. This he did not do. The association not being in liquidation, its funds and property are not subject to distribution to the membership. The effect of the allocative method was to give those continuing as members and paying the increased rates the benefit of reduction in the amount of such rates, the association at all times retaining and preserving the fund for the purposes for which it was collected, that of paying accruing death claims of members in good standing. It had a right so to do. *Jenkins* v. *Talbot,* supra; 19 R. C. L. 1267. The deceased could assert his interest in the fund only by remaining a member and meeting his obligations to the society in one of the ways provided by its laws.

Plaintiff strongly urges applicability of the rule that where an insurance company renounces liability on a valid policy before loss, the insured is excused from tendering premiums, and, after loss, the company must pay the policy less the amount of the premiums due and unpaid. Citing in support thereof, *Wayland* v. *Western Life Indemnity Co.,* 166 Mo. App. 221, 148 S. W. 626; *Shaw* v. *Republic Life Ins. Co.,* 69 N. Y. 286; 5 Page on Contracts 5096. She concedes the right of the insurer under such circumstances to withdraw its wrongful renunciation, but insists that such withdrawal of renunciation must be by notice to the insured. This rule is said to apply because after the attempted termination of White's membership for failure to pay extra assessments and the decision of the Colorado

court annulling the amendments of 1928, the company withdrew its position theretofore taken and gave the insured an opportunity to come in under the plan adopted in 1931. This change of position and offer of option to retain membership, she claims, should have been brought home to White by either actual notice or personal service of notice to that effect. She contends the mailing of the official organ by second class mail, hereafter referred to, if actually mailed, was insufficient for the purpose of notice. There is evidence that notice of the action of the Head Camp Session of January, 1931, was given White by mailing to him by second class mail, return postage guaranteed, a copy of the January-February, 1931, issue of the Pacific Woodmen, the official organ of the defendant, containing full notice and information of the enactments in question and of the four options heretofore referred to. On the other hand, Mrs. White testified that the copy was never received at the home within her knowledge. There was no finding on this issue, but since the court directed a verdict on defendant's motion containing grounds which made it unnecessary to find on the fact of notice, we need not further discuss that phase of the matter. If the decision turned on whether actual notice was served on White, the plaintiff would have been entitled to go to the jury on that issue. *Christensen* v. *Utah Rapid Transit Co.*, 83 Utah 231, 27 P. (2d) 468.

It is plaintiff's contention, and is the effect of the trial court's ruling, that White was a member in good standing, at least until January of 1931, at the time of the enactments of the special Head Camp Session. As such member, he failed or refused to comply with the requirements of these enactments, the opportunity being held open to him until May 31, 1931. As a consequence, his membership terminated at that time, if defendant's contention is correct, that being a member he was legally and conclusively presumed to have knowledge of such enactments and was bound thereby.

We think, under the authorities, he was legally and con-

lusively presumed to have knowledge of the change in the constitution and by-laws and of the new plan set up by such amendments. When White joined the organization, the following provision of the constitution was in effect:

"Tenth. A certificate is issued to and· accepted by a member with the understanding and agreement that his contract in this Association shall consist and be composed of, his application, the medical examination certificate, his benefit certificate, together with this Constitution, or as the same may hereafter be changed, altered, added to, amended or repealed; and he stipulates and agrees for himself and his beneficiary that no agent or representative of this Association nor any officer or member of a local Camp has the right or power, by any statement, agreement or promise, or by any method of transacting business with its members, to waive a strict observance and compliance with the laws, rules and regulations of this Association as set forth in this Constitution, and By-laws, of his Camp, and such amendment or alterations therein as may be hereafter made. Nor, has any such person the right to alter, change or amend the contract between himself and this Association as above defined. And he warrants that neither himself nor his beneficiary will rely upon any such waiver or statement made, or upon any agreement, promise or method of transacting business with himself by any such agent, representative, officer or member."

Under such provision, it has been held that a member is presumed to know not only the provisions in his contract, which includes the certificate, application, medical examination certificate, and the constitution as existing at the time, but all changes in the laws of the association made thereafter.

The rule is thus stated in 45 C. J. 29:

"The members of a fraternal organization, and their beneficiaries, *are conclusively presumed to have contracted for insurance with reference to and are bound by, the terms of the charter, constitution and by-laws, even though they have no actual notice thereof, particularly* where such constitution and by-laws are made a part of the contract or referred to therein. * * *" (Italics ours.)

The foregoing rule applies to subsequently enacted legislation, as appears from the following, 45 C. J. 41:

"The rule that the members of a fraternal benefit society are bound to take notice of its laws applies to alterations therein; and accordingly the fact that a member was ignorant of changes does not exempt him from their operation, if they are reasonable and otherwise binding on him in the absence of fraud or estoppel, although the parties may stipulate what alone shall be legal notice of a change."

In *Eversberg* v. *Supreme Tent Knights, etc.*, 33 Tex. Civ. App. 549, 77 S. W. 246, 248, the court said:

"There is an entire absence of evidence as to what notices were required to be given the members. * * * There being no by-law which required the publication of the amendment in order to give it effect, it became, when regularly adopted, the law of the order, and all of the members were charged with notice of its adoption." *Supreme Lodge, Knights of Pythias*, v. *Knight*, 117 Ind. 489, 20 N. E. 479, 3 L. R. A. 409; *Everett* v. *Supreme Council, Catholic Benev. Legion*, 236 N. Y. 62, 139 N. E. 780; *Sawyer* v. *Sovereign Camp, W. O. W.*, 105 Neb. 395, 181 N. W. 191; *Sovereign Camp, W. O. W.*, v. *Barnes*, 154 Ark. 486, 243 S. W. 55.

The principal case relied on by plaintiff, *Wayland* v. *Western Life Indemnity Co.*, supra, is one wherein the defendant was an old line assessment company and not a fraternal benefit association such as the Woodmen of the World. The learned judge who wrote the decision drew the distinction between that sort of case and one involving membership in a fraternal organization. The rule, the court said, was applicable to an old line company but distinguished as to a fraternal organization, as follows:

"And there is another class of cases to which we are referred that are not in point. They relate to the suspension or expulsion of members of fraternal beneficiary societies, stock exchanges, guilds, etc. *Glardon* v. *Supreme Lodge*, 50 Mo. App. 45; *Miller* v. *[United States] Grand Lodge*, 72 Mo. App. 499; *Lavin* v. *Grand Lodge*, 112 Mo. App. 1, 86 S. W. 600; *Bange* v. *Supreme Council*, 128 Mo. App. 461, 105 S. W. 1092; *Konta* v. *St. Louis Stock Exchange*, 189 Mo. 26, 87 S. W. 969. A terse statement of the rule of such cases is that a member of a lodge, fraternal society, or guild should exhaust the remedies offered him by the rules and practices of the society for the correction of an injury caused by a wrongful suspension or expulsion

before he resorts to the courts, and, failing to avail himself of such opportunity, will be held to have acquiesced in his suspension or expulsion. Conceding arguendo the soundness of this rule, it does not apply to old line or assessment insurance, where, as here, the so-called member is a member only in name, and has no opportunity of appealing to the legislative body of a democratic organization for a redress of his wrongs. *In Lavin* v. *Grand Lodge,* supra, Goode, J., observed the difference in this respect between fraternal and old line or assessment insurance. Speaking of decisions relating to the latter classes of policies, he says: 'It is obvious such decisions have a very remote bearing on the question at issue in the present controversy. They were given in cases not against benevolent societies, but where a company organized for profit was endeavoring to avail itself of a default which it had caused. The purpose of the present defendant is not profit, but to provide for the families of deceased members; and there is nothing even tending to prove it would have refused to reinstate Lavin, or correct the blunder made against him, if he had sought redress. No motive for such a refusal appears.'" *Wayland* v. *Western Life Indemnity Co.,* 166 Mo. App. 221, 148 S. W. 626, 630.

Plaintiff concedes that it may be that a member, both de facto and de jure, ought to be presumed to know what is going on within the organization, but that such presumption ought not to be applied; that one did know of such changes, when he was excluded in fact from the ordinary channels of communication. The difficulty of this reasoning is that it proceeds on the theory that White was a member for the purpose of all benefits and privileges, ■ which the plaintiff now asserts and attempts to sue upon, but that he was not a member for the purpose of assuming any duties, responsibilities, or obligations incident to membership. If he was a de jure member, which we must concede he was under the decision in the McCue Case, for that case left the association and its membership in the same situation as if the changes in its laws had never been enacted, then the renunciation of White's membership by the association was a mere nullity. A renunciation which had no effect was utterly null and void and would not have to be withdrawn. He must now be treated as in the class in which plaintiff puts him. That is, a member of the association, at

least up to the time when his opportunity of exercising an option expired on May 31, 1931, but he cannot be treated as a member entitled to all rights and benefits of membership after that time when he did not attempt to bear any of the burdens and responsibilities of membership.

Through error in procedure, the attempted legislation of 1928 was ineffectual. White knew of this attempted change in policy and increase in rates of insurance. While there is no evidence that he had actual knowledge of the subsequent lawsuit, its results, and the legislation of 1931, it is hardly conceivable that as a member of the association, interested in its affairs, and in his own rights under his certificate of membership, he remained in ignorance of such events. He, however, did nothing in the way of asserting any right, or even making any inquiry as to what rights he might assert, at any time after his refusal to pay the increased assessments. Under the circumstances, he was presumed to know. Neither his contract nor the constitution or by-laws of the association required the giving of notice to him of any change in the constitution or by-laws. Had there been any such requirement of notice, or notice in a particular manner, he, or his beneficiary after his death, could claim the right to notice of such change. *Courtney* v. *United States Masonic Ben. Ass'n* (Iowa) 53 N. W. 238; *Thibert* v. *Supreme Lodge,* K. of H., 78 Minn. 448, 81 N. W. 220, 47 L. R. A. 136, 79 Am. St. Rep. 412.

The judgment of the district court of Salt Lake county is affirmed. Costs to respondent.

ELIAS HANSEN, C. J., and EPHRAIM HANSON and MOFFAT, JJ., and EVANS, District Judge, concur.

WOLFE, J., being disqualified, did not participate herein.