# LAWSON v. WOODMEN OF THE WORLD

No. 5526.   Decided January 13, 1936.   (53 P. [2d] 432.)

*Dan B. Shields,* of Salt Lake City, and *John L. Schweigert,* of Denver, Colo., for appellant.

*G. M. Sullivan* and *E. M. Morrissey,* both of Salt Lake City, for respondent.

LARSON, District Judge.

The defendant, Woodmen of the World, is a fraternal benefit society or association, organized as a corporation under the laws of Colorado in January, 1891, and doing business in nine western states. It has a representative form of government, and its supreme legislative and governing body is known as the Head Camp Session which has met quadrennially since 1920. The association is made up of local camps in such communities as have a sufficient membership to sustain a camp. The Head Camp Session is composed of representatives elected by benefit members of the association, by districts, together with the general officers of the order. These Head Camp Sessions make, change, or amend the constitution and by-laws of the association and select its general officers. A major purpose of the association is the payment of death benefits, or insurance, to the

beneficiaries of deceased members, through monthly assessment calls on its membership, single or multiple, as may be necessary to pay death claims, within twenty days after approval of the proofs of death. In its earlier years, when its membership was principally younger men and death claims low, the order accumulated some funds, but these were not a "reserve" as that term is used in insurance. By 1928 the company had around $220,000,000 outstanding benefit certificates or insurance on its members and about $9,000,000 on hand. In 1927 the association, experiencing an increased number of death claims, instead of levying the necessary multiple assessment to pay such claims, and contrary to the rule of the order, used part of this $9,000,000 fund in payment of death claims. In April, 1928, the insurance commissioners of the states in which the defendant operates took exception to the financial condition of the order and recommended that the next Head Camp Session make certain specified changes in the rates and policies of the company to make the same actuarily solvent, based upon the American Experience Table of Mortality. The Head Camp Session met in June, 1928, at Oakland, Cal., and the proposed changes were submitted at the last meeting of the session. The officers declared the constitution amended to set up a "Reserve Division," to which the members could transfer without medical examination at an advanced rate based upon their then attained ages, the payments to go into a special fund or reserve for the payment of the policies only. All new members were required to come into this class. Members who did not transfer to the Reserve Division and exchange their old certificates for new ones were carried in a group and required to pay extra or multiple assessments to meet the death claims arising among them. The business of exchanging policies was carried to the Reserve Division by the company until May, 1929, when some 85,000 members had transferred, and at that time John J. McCue and others filed a suit in equity in the district court in and for the City and County of Denver, state of Colorado, en-

titled *McCue et al.* v. *Woodmen of the World et al.*, by which they sought to have the amendments creating the Reserve Division declared invalid and the officers of the association enjoined from levying extra or multiple assessments against those members who had failed or refused to effect an exchange of certificates pursuant thereto. The district court upon trial made findings and entered judgment therein in favor of plaintiffs on November 18, 1929. This judgment was affirmed by the superior court of Colorado on December 30, 1930, the court saying:

"The decree of the District Court in effect left the Woodmen of the World and its membership in the same condition, and with the same rights and duties as though no amendment had been attempted. Only in so far as this decree effectuates this purpose it is affirmed."

A special meeting of the Head Camp Session, consisting of the same delegates as made up the Head Camp Session of 1928, was called and convened in Denver, January 12 to 16, 1931, for the express purpose of taking action upon the condition resulting from the litigation. It enacted, by roll call vote of 1,243 affirmative to 59 negative, the identical legislation or amendments acted upon in the meeting of 1928 and constituting the subject-matter of the litigation in the McCue Case, without changing a letter or punctuation mark, and added thereto a curative retrospective provision making the same effective from and after the 1st day of September, 1928, reading as follows:

"That the above and foregoing Sections Nos. 1 to 24 inclusive, amending the Constitution of the Woodmen of the World, and each, all and every section thereof, shall be retroactive and shall be in full force and effect from and after the first day of September, 1928."

A resolution ratifying and affirming the action of the regular meeting of the Head Camp Session of 1928, concerning the amendments in question, and all acts or things done pursuant thereto, was also adopted by the special meeting of the Head Camp Session of 1931.

Plaintiff brings this suit in seventeen causes of action in his own right and as assignee of sixteen other parties, who are or were prior to 1929 members of the defendant association, to recover from defendant, as for money had and received, moneys paid by plaintiff and his assignors on their fraternal insurance between June, 1928, and until the time they dropped out of the order or until the action of the Head Camp Session in 1931 at its special meeting above set forth, in excess of the amounts paid prior to June, 1928, by plaintiff and his assignors. Plaintiff and his assignors naturally fall into four groups: Plaintiff Lawson and C. A. Pfaw, assignor of the third cause of action, Hugo D. E. Peterson, assignor of the sixth cause of action, and Peter S. Wilson, assignor of the thirteenth cause of action, exchanged their old fraternal certificates for new certificates under the Reserve Division, have kept up their payments thereunder, and are now members in good standing under those new certificates. They seek to recover the difference in amount they had been paying before the exchange and the rate under the new policy from the date of exchange to May, 1931, when the action of the Special Head Camp Session was effected.

The second group, consisting of C. M. West, C. E. Goss, Bryant L. Young, O. P. Soule, George F. Thompson, C. W. Sherwood, Robert Croft, R. T. Croft, C. G. Croft, Ephraim Goodman Maw, assignors of the fourth, fifth, sixth, seventh, eighth, fourteenth, fifteenth, sixteenth, seventeenth, and eighteenth causes of action, respectively, surrendered their old certificates, took new certificates in the Reserve Division, paid the new rate under the policy for some time, and dropped out of the order prior to May, 1931. They seek to recover the difference in rate between what they had been paying prior to the exchange and what the rate was under the new certificate.

John W. Lawson, assignor of the second cause of action, exchanged his certificate, made his payments under the new rates of the Reserve Division until August, 1929, when

he died, and his widow was promptly paid the amount of his new certificate.

The fourth group, George F. Thompson, August Welmer, Harry McCoard, and William McCoard, assignors of the ninth, tenth, eleventh, and twelfth causes of action, respectively, did not make an exchange of policy, paid some multiple assessments, and dropped out during 1929. They seek to recover the increased or multiple assessments of more than one per month.

The district court of Salt Lake county found for the plaintiff on each cause of action and entered judgment accordingly, and the defendant brings the cause here for review on ninety assignments of error.

We shall next examine the cause as it affects the various groups above set out and then dispose of any remaining assignments of error. It is the position of plaintiff that the action of the Head Camp Session at Oakland in June, 1928, in creating the Reserve Division and setting up new schedules of rates for those who transferred thereto, and the necessity thereby created of additional extra or multiple assessments on those who did not transfer or exchange, in order to meet death claims in that class, was null and void, and therefore any increased payments made were an unjust enrichment of defendant at the expense of plaintiff and his assignors; that such payments were unlawfully collected and therefore should be returned to the members paying the same. No contention is made that defendant association could not change its policy and its rates of payments in proper proceedings under its constitution and by-laws. The claim is that no such change was made until after any date involved in these claims, that is, until the Special Head Camp Session of January, 1931. Much has been said in the brief of counsel and in the oral arguments as to the good or bad faith of the officers of the defendant corporation in attempting to effect the changes at the Head Camp Session at Oakland in 1928, and of the necessity or lack of such need, in making the changes at-

tempted in 1928, but these matters are of little consequence in the view we take of the issues presented. As to claims listed in group 1 above, plaintiff and his assignors Pfaw, Peterson, and Wilson exchanged their old certificates for new ones in the Reserve Division in 1929, have paid all rates or premiums required thereby, and still hold the certificates as valid and effective, being members of the order in good standing under such certificates. These new certificates carry a rate or premium based upon attained age at birthday nearest date of issue, as determined by the American Experience Table of Mortality. In other words, these policies, which plaintiff and these three assignors still claim are valid and assert insurance under against the association, bear date of 1929 and carry a rate based upon attained age in that year. It is plaintiff's position, therefore, that the issuance of these four policies in 1928 was valid, or was rendered valid from its date by the retroactive action of the Special Head Camp Session in 1931 as against the lodge, but the rate or premium to be paid by the insured was not valid until 1931. These parties do not offer to surrender their contracts of insurance in the Reserve Division under which they paid the rates they seek to recover here, nor do they offer to pay new rates on their policies of insurance (Reserve Division) though issued in 1929, based upon their attained age in 1931, after which date they do not question the legality of the policies they hold nor the rates or premiums specified therein. They seek to accept the benefits of the contract, but avoid the full force of its obligations. This they cannot do.

"When one having the right to accept or reject a transaction takes and retains the benefits thereunder, he becomes bound by the transaction, and cannot avoid its obligation or effect by taking a position inconsistent therewith." 16 Cyc. 787.

"A party to a transaction cannot ordinarily affirm it in part and in part disaffirm it. Thus with regard to rights claimed under a contract, a party will not be allowed to assume the inconsistent position of affirming the contract in part and disaffirming it in part." 16 Cyc. 791.

By keeping, paying on, and asserting protection under the contract or policy of 1929, with its rate, they have by act, word, and conduct ratified the conditions and terms thereof and cannot now be heard, while still holding their contracts, to assert that the payments made thereunder were not properly collected from them and constitute excess payments or unjust enrichment in the hands of the association. What has been said with regard to the claims of plaintiff, Pfaw, Peterson, and Wilson applies with equal force and effect to John W. Lawson, whose position was identical with these until his death after the commencement of this action when his new Reserve Policy was paid in full to and such payment accepted by his beneficiary. It follows, therefore, that the trial court was in error in awarding plaintiff a judgment upon his first, second, third, sixth, and thirteenth causes of action.

The fourth group above set forth, to wit, the claims of George F. Thompson, August Welmer, Harry McCoard, and William McCoard, assignors of plaintiff's ninth, tenth, eleventh, and twelfth causes of action, is likewise not difficult of solution. These assignors were members of the order who did not transfer to the Reserve Division as set up in 1928. They paid the old rates plus multiple assessments for some months and then dropped out or lapsed their certificates. The increase in assessments, that is, the levying of multiple assessments on all members who did not transfer to the Reserve Division, began in May, 1929. Until April 25, 1929, only the regular assessments had been levied on the holders of benefit certificates who did not exchange their certificates or transfer to the Reserve Division. In May, 1929, one regular and four extra assessments were levied, which were paid by all four of these members in June, 1929, one regular and five extra assessments were levied, which all four paid; in July, 1929, one regular and ten extra assessments were levied, which the McCoards paid, but Welmer and Thompson refused to pay and lapsed their certificates; in August there were one

regular and ten extra assessments, and the same in September, when the McCoards quit paying and lapsed out. In May, 1929, John J. McCue and five other members, who had refused to exchange their certificates to the Reserve Division, filed in the district court for the City and County of Denver, state of Colorado, an action in equity, against the Woodmen of the World and others seeking to have the court determine, adjudge, and decree that the attempted amendments and enactments of the Head Camp Session held at Oakland in 1928 were wrongful, unlawful, null, and void; that said court thereupon issued an injunction pendente lite, restraining and enjoining the defendant, inter alia, "(3) from issuing or levying any assessment against members of the Woodmen of the World in excess of one regular assessment for each calendar month"; that notwithstanding said order and injunction the defendant continued to levy extra and multiple assessments as indicated above. Upon trial had in November, 1929, the court found and held that the attempted amendments and enactments at Oakland in 1928 were not properly passed and were null and void, which decision was affirmed by the Supreme Court of Colorado (*Woodmen of the World* v. *McCue*, 88 Colo. 209, 294 P. 947); that the judgment of said district court further provided:

"That all assessments levied on members, beginning with the assessment notice of April 25, 1929, over and above one regular assessment per calendar month, have been by this court adjudged to be illegal and void, and that no member in good standing in the Woodmen of the World on April 25, 1929, has lost his membership or standing by reason of failing to pay any of said assessments, or by reason of failure to pay any part of said assessments, and that any and all alleged suspensions on account of any failure to pay any part of said assessments are illegal and void, and that .any member in good standing on April 25, 1929, who within thirty days from the date of said notice herein ordered to be sent out, pays to the clerk of his camp the amount of one regular assessment for each month beginning with the month of May, 1929, in accordance with the provisions of the constitution as it existed at the time of the meeting of the Head Camp Session at

Oakland, California in June, 1928, together with any and all camp dues and other charges required by the rules and laws of his local camp, has and shall have all the rights and privileges of membership the same as if one assessment had been made or levied in each of said calendar months, and the same as if payment had been promptly made by the member. * * *"

Plaintiff seeks to recover on these four claims, not the regular monthly assessment, but the extra or multiple assessment levied and paid during the months indicated. Appellant contends that such payments cannot be recovered because: First, they were made voluntarily with notice; second, the moneys so received have been, by the company, paid out in settlement of death claims. Respondent, on the other hand, takes the position that the Colorado court, having determined that the amendments were void and the assessments illegal, this court is bound thereby, and the money having been unlawfully collected should be returned. By appellant's first proposition, we understand it to mean that since the McCue Case was pending at Denver when these payments were made, and plaintiff's assignors had knowledge that the suit was pending and that the Colorado court had enjoined the company from levying the assessments sought to be recovered, they must be held to have paid them voluntarily—contributions, as it were—and therefore should not be permitted to recover them. It is somewhat unusual to hear a party contend that because he acted wrongfully and in defiance of a lawful court order, that should constitute a defense to his acts so done. It should also be borne in mind that the temporary injunction was not entered until June 28, 1929, after which date assignors Thompson and Welmer made no payments. The McCoard boys paid only two months after and then quit, some months before the trial of the cause. Furthermore, there is no evidence that these parties made any payment after they had actual notice of the injunction at Denver. Under the record, the claim of payment with notice as a defense must fail.

Likewise, appellant's argument that it has expended the money so collected in payment of death claims is no defense to this action. It may be a defense in common-law replevin, but it is hardly a defense to an action for money had and received, to plead that the receiver has paid out the money on a debt he justly owed, and therefore cannot return it. Much argument has been had as to the extent the *McCue Case,* supra, is res judicata of the issues here. Certainly it settled here and for all time, as between the Woodmen of the World and its then members, the fact that the attempted changes in the constitution and by-laws at the Oakland Head Camp Session in 1928 were ineffectual, null, and void, and not binding upon the membership, and ineffectual for the purposes attempted. Such being the case, the payments sought to be recovered in these four causes of action cannot be founded or based upon any action of the 1928 Head Camp Session. Is there then any basis for these assessments, independent of the action of the Oakland Camp, which would bar plaintiff's recovery? The constitution of the association, as adopted at the 14th Head Camp Session, 1924 (Exhibit 14), page 147, reads:

"The Head Officers above mentioned authorized to sign assessment calls, shall call a double or multiple assessment for any month when at any time the funds available in the Benefit Fund for the payment of death claims, are not sufficient to pay monthly all proved death claims. In making assessments said Head Officers shall, so far as practicable, be governed by the following rule, viz: They shall cause the Benefit Fund to be so maintained and replenished that each death claim may be paid within twenty days after the death proofs are approved, and that each monument for which the Association is liable may be paid for within twenty days after the Head Clerk receives proper evidence of its erection.

"In each assessment call the names of deceased benefit members in good standing, whose death proofs have been fully approved since the last assessment call, shall be stated, also the camps of which they are severally members, and the names of their several beneficiaries. In any event, at least one assessment shall be called for each and every calendar month."

The same provision as to members not transferring to the Reserve Division appears in the constitution adopted at the Oakland 1928 Head Camp Session. (Exhibit 15, page 175.) The conditions here fixed for the issuance and levying of extra, double, or multiple assessments are: (1) That funds available for payment of death claims are not sufficient to pay monthly all proved death claims; (2) names of deceased, their camp, and beneficiaries must be given in the call. Only upon these conditions can a double or multiple assessment be valid and effective.

Apart from the determination in the *McCue Case* of the invalidity of the proceeding under and following the Head Camp Session at Oakland in 1928, the record before us does not sustain a conclusion that these multiple assessments were proper, valid, or justified. As far as the pleadings and evidence disclose, prior to July, 1927, all death claims had been met as required by the regular levy of one assessment per month; that during the year of July, 1927, to June, 1928, inclusive, the regular levy of one assessment was not sufficient to pay the death claims; that the regular assessment for March, 1929, brought in $132,697.40, or $2,197.40 more than required to pay all death claims proved and payable during the month, and that such assessment was levied only upon those members who had not exchanged their certificates or transferred to the Reserve Division; that in April, 1929, the company commenced the levy of extra or multiple assessments, viz., four in May, five in June, and ten in July, and ten in August, which form the basis for the claims in these causes of action. Appellant asserts in its answer that the death claims during these four months far exceeded the receipts even after the multiple assessments were levied, but assessments to meet these death claims were levied only upon a fraction of the membership, to wit, those who had not transferred to the Reserve Division. Appellant concedes that the *McCue Case* is controlling and effective to the extent that it vitiated the attempted amendments at the Oakland Session of 1928,

and left the association and its membership in the same position as if the amendments had not been attempted. Such being the case, there was no authority for setting up the Reserve Division and exempting its membership from death benefit assessments. It appears, therefore, that there is no justification for the levy of multiple assessments upon part of the membership only, and, especially so, where the regular assessments were made only as to such part of the membership. The basis of fraternal insurance is that each member must be called upon to contribute his share, and exempting many at the expense of the few vitiates the extra assessments, renders them invalid, and constitutes moneys unlawfully collected and unjustly retained, and that in good conscience the company should be required to return the same, and plaintiff is entitled to judgment as rendered on his ninth, tenth, eleventh, and twelfth causes of action.

This brings us to a consideration of the second group of claims, set forth as the fourth, fifth, seventh, eighth, fourteenth, fifteenth, sixteenth, seventeenth, and eighteenth causes of action. Plaintiff's assignors in these causes exchanged their certificates for new certificates in the Reserve Division, at different dates between December 1, 1928, and July 1, 1929. After paying for some time under the new policies, they quit paying and lapsed out at varying dates prior to May, 1931. These assignors, upon exchanging their certificates for new ones, that is, upon transferring to the Reserve Division, surrendered their old certificates and with that surrender executed an instrument in words and figures as follows:

"I agree that upon the taking effect of the new certificate herein applied for, that my old certificate shall become null and void, and I do hereby, for myself and my beneficiaries, and for anyone claiming any right in, through, or on account of said certificate, release the Woodmen of the World from any and all liability thereunder.

"I further agree that this application for exchange shall become a part of my original application for membership. I understand that I am to continue a member of said Camp and pay Camp dues to the Clerk as I have done in the past."

Appellant asserts that such instrument, together with the facts that the payments were made voluntarily thereafter, constitutes a release and estoppel against plaintiff and his assignors in group 3. Respondent, on the other hand, takes the position that the new or reserve certificates were null and void for want of authority in the company to issue them, and that the releases and exchanges were procured fraudulently, and therefore appellant cannot invoke estoppel against these claims. While we do not wish to be understood as placing any stamp of approval upon the methods by which the amendments of 1928 were attempted, nor by which the exchanges of certificates were effected, the record does not disclose any proper pleading or any evidence to justify a cancellation of the contracts or a recovery of the money paid upon the ground that they were entered into or procured by fraud or misrepresentation, or that appellant's conduct was such as to bar it from setting up a defense of estoppel. As to respondent's other contention, the Colorado court found, and we have held that judgment to be binding on this court, which is not disputed by appellant, that the proposed amendments of 1928 were never adopted, and left the association and its members in the same position as though the amendments and changes had never been attempted. The certificates in the Reserve Division at the time they were issued were so issued without any lawful authority in the company to issue them and in violation of the provisions of its constitution; they were ultra vires and voidable. Appellant argues that this defect was cured, however, by the action of the Special Head Camp Session at Denver, 1931, which re-enacted the amendments attempted by the Oakland Camp in 1928 verbatim, and added a retroactive or curative provision as follows:

"That the above and foregoing sections, Nos. 1 to 24, inclusive, amending the Constitution of the Woodmen of the World, and each, all, and every section thereof, shall be retroactive and shall be in full force and effect from and after the first day of September, 1928."

We held, in connection with group 1, that this curative act validated all reserve certificates in good standing from the date of their issuance. An ultra vires act, an irregular act, a voidable act, may under proper authority be validated by the company so as to bar it from subsequent denial of its validity and to estop any one else from denying its validity for want of power or authority in the company to enter into it; but a curative act by the company cannot validate the contract as against accrued rights of other parties. Here the certificates in question were lapsed and nonexistent as contracts or policies of insurance before the curative act of 1931. When the Special Head Camp Session, 1931, made retroactive the amendments then adopted, and validated all existing contracts, neither the plaintiff nor his assignors could assert any rights under the certificates which had been issued; no rights could be preserved by the validating act because no rights under the certificates then existed in any one or could thereafter exist in any one. These certificates, and any rights of the parties thereto, were the same before the validating act as after. No more rights could accrue or be asserted thereunder, and the certificates were given no force or effect by the action of the Special Head Camp Session of 1931. We must conclude, therefore, that the act of 1931, Special Head Camp Session, did not and could not affect these assignors or any claim they might have against the company for any past act, deed, or conduct.

The Reserve Certificates, issued under the attempted amendments of 1928, were issued without authority and were not valid contracts of insurance until the amendments to the constitution in 1931, when those still existing were validated by the curative and retroactive provision then adopted. The difference in the rate under the new policy and the regular assessments under the old policies was therefore money collected somewhat in the nature of overcharges of the amounts due under the respective policies. The questions therefore are: Can plaintiff or his assignors

recover back as money had and received the sums so paid as overcharges? Has the conduct of plaintiff's assignors been such as to constitute a waiver of the right to recover and an estoppel?

In exchanging their old fraternal certificates for new ones in the Reserve Division, plaintiff's assignors signed written applications and agreements to pay the new rate and that the old certificates should "become null and void, and I do hereby, for myself and my beneficiaries and for anyone claiming any right in, through, or on account of said certificate, release the Woodmen of the World from any and all liability thereunder." If the new certificates be considered as a nullity, the payments would be in the nature of overpayments on the old certificates, and under the constitution of the association would be in effect payments in advance, as therein provided, and have the effect simply of continuing the certificates in effect, that much longer after remittance stopped, and the same has long since been used up as payments due under the old certificates. The old certificates had no surrender value. They lapsed any time upon nonpayment and there was no remaining equity therein.

If, on the other hand, it be considered that the old certificates were surrendered and new contracts made under which the higher rates were paid, there is no question of overcharges. The parties had their new certificates and were insured thereunder, for which they paid their premium. The validity of those new contracts as to these parties has never been in question. The company always held and contended that the policies were valid and binding and they would have been promptly paid had the assured died. To make assurances certain, in 1931 it validated all policies by retroactive action. We do not think assured will complain that their beneficiaries did not collect thereon because they did not die, and we must conclude that it was to the interest of both assured and their beneficiaries. Under either view, the conclusion is forced upon us that there can

be no recovery on these causes of action, to wit, the fourth, fifth, seventh, eighth, fourteenth, fifteenth, sixteenth, seventeenth, and eighteenth counts, and as to those the trial court was in error.

While appellant has set forth numerous assignments of error, many of them relate to the admission or rejection of evidence which, under the view we have taken, does not affect the results in this cause. The other assignments have to do with the legal questions as interpreted by the court contrary to counsel's views. Those assignments are disposed of in the views expressed in this opinion and need no further elaboration.

The judgment is affirmed as to the ninth, tenth, eleventh, and twelfth causes of action, and reversed as to the first, second, third, fourth, fifth, sixth, seventh, eighth, thirteenth, fourteenth, fifteenth, sixteenth, seventeenth, and eighteenth causes of action. The cause is remanded to the district court of Salt Lake county with directions to vacate the judgment except as to the ninth, tenth, eleventh, and twelfth causes of action, enter a judgment for plaintiff on those four causes, and for defendant on the other causes of action. Each party to pay his or its own costs.

ELIAS HANSEN, C. J., and FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.

WOLFE, J., being disqualified, did not participate herein.