## SOVEREIGN CAMP, W. O. W. v. SMITH.

No. 25161.   March 3, 1936.

Rehearing Denied April 7, 1936.

Application for Leave to File Second Petition for Rehearing Denied
April 21, 1936.

J. B. Moore, for plaintiff in error.

R. E. Bowling, for defendant in error.

PER CURIAM. This appeal involves an insurance policy issued upon the life of Albert P. Smith. We shall refer to the parties as they appeared in the trial court where the case was tried to the court without the intervention of a jury. The plaintiff was the beneficiary and the suit was to collect the double liability which the policy provided would be payable in case of accidental death. Deceased consented and agreed in his application for such insurance that the constitution and laws of the defendant association then in force or thereafter adopted should become a part of any certificate issued by the defendant association. Such constitution and by-laws contained a similar provision.

The defendant in its answer alleged and at the trial proved that several years after the deceased became a member of the association, an amendment to the constitution, laws and by-laws was adopted which was in force at the time of his death and which was as follows:

"The association shall not be liable for the payment of double indemnity under any beneficiary certificate providing for double indemnity in case of death of the member by accident, where it is claimed that death resulted from accidental drowning, cutting, poisoning, hanging, discharge of fire arms or shooting, unless the fact that such drowning, cutting, poisoning, hanging, discharge of fire arms or shooting was accidental shall be established by the testimony of at least one person other than the member, who was an eyewitness to such drowning, cutting, poisoning, hanging, discharge of fire arms or shooting."

This amendment for convenience will be termed "the eyewitness clause," and the appeal involves the construction and application thereof to the facts proved in the case.

Such facts in so far as they are material were as follows: The deceased was engaged in the lumber business, his place of business being located in close proximity to his home in the town of Stratford. He was of a jovial disposition, a church member, and had six children. On January 22, 1932, he spent the morning hours at the lumber yard and in the afternoon he remained at home listening to the radio and playing dominoes with one of his boys who was too sick to go to school. His wife, the plaintiff, was piecing a quilt in the same room. The oldest child, a senior in school, arrived home about 3:15 o'clock and brought the mail to his father and his father instructed him to go to the lumber yard office and answer some letters, which he did and upon his return, his mother sent him to the store for some cotton for the quilt. He returned from this errand in a few minutes and as he went in the house he met his father coming out the back door, going toward some outbuildings, including a brooder house. They had some conversation about the boy having forgotten to feed the hogs at noon and the father picked up a bucket and started out toward the barn. It appears that the deceased had some chickens on the premises and cats had been destroying some of them and they had a shotgun borrowed from a neighbor for the purpose of killing stray cats and this shotgun was kept in a washhouse. In two or three minutes after the deceased left the house, a gunshot was heard, and when the son went down to the brooder house he found his father dead. There is no evidence in the record as to the nature or location of his wound excepting a certified copy of the verdict of the coroner's jury, which was introduced over the objection of the defendant association, and which states that the wound was in the head of the deceased. There was no actual eyewitness to the shooting.

It further appears from the record that the plaintiff made proof of death to the defendant and had some correspondence with the defendant which declined to pay the double liability on the policy because there was no eyewitness to the death of the deceased, and that it tendered her the sum of $1,025.52 in settlement of the certificate, and she first refused to accept it, but later she came back to the witness who was handling the matter for her and who at the time of the death of the decedent was the local treasurer of the defendant, and advised him that she would accept the draft on account but not in full payment and would bring suit for the remaining $1,000. which she claimed was due her under the double liability clause, and he delivered the check to her and transmitted such information to the company. She cashed the draft indorsing the same on the printed form thereon, which provided, in substance, that she acknowledged full payment under said certificate and accepted the same in full of all demands against the defendant association. This draft was paid.

The defendant association is a corporation incorporated under the laws of the state of Nebraska and licensed to transact business as a fraternal beneficiary association in the state of Oklahoma.

The points at issue are: First, the effect of the absence of an actual eyewitness to the shooting; and, second, the question of estoppel on the part of the plaintiff, she having accepted the check above mentioned and made the above indorsement thereon.

Both plaintiff and defendant agree that these are the sole questions in the case.

The defendant in its brief contends that the eyewitness clause is valid and enforceable, and, in effect, asks for a literal construction thereof. It is quite evident that such a construction under the facts and evidence would bar a recovery, as it is admitted that there was no actual eyewitness who saw the shooting.

The plaintiff, on the other hand, contends that the clause is invalid and unenforceable, but, in any event, is not to be strictly construed, and that there were eyewitnesses whose testimony, under the law, was sufficient to meet the requirements of the eyewitness clause, although such witnesses did not actually see the gun discharged.

Taking up first the question of the validity of such provision, the plaintiff relies upon the case of Modern Woodmen of America v. Michelin, 101 Okla. 217, 225 P. 163, which case involved the seven years' absence rule and a clause in the contract that such absence shall not be regarded as evidence of death until after the full term of the member's life expectancy. That case did hold such a clause contrary to public policy and void. However, it was decided before the Supreme Court of the United States handed down its decision in Modern Woodmen of America v. Mixer, 267 U. S. 544, 69 L. Ed. 783, wherein the court held that a citizen of one state becoming a member of such a society is bound by a by-law subsequently adopted which is declared valid by the courts of the state of the domicile of the society; that "membership looks to and must be governed by the law of the state granting the incorporation." The case involved the identical question passed upon in the Michelin Case, and by reason of that decision, the Michelin Case was practically (but not expressly) overruled by this court in De Vore-Norton v. Brotherhood of Locomotive Firemen, 132 Okla. 130, 270 P. 12, wherein it was stated that "the rule announced in the Mixer Case * * * is controlling in this state." And in Modern Woodmen of America v. Crudup (decided by this court on October 15, 1935, long after the briefs were filed herein), 175 Okla. 183, 51 P. (2d) 718, the Michelin Case was

again overruled by implication and the rule anounced in the De Vore-Norton Case expressly adopted.

We, therefore, must look to Nebraska for the correct rule to be followed in the instant case (the defendant being a Nebraska corporation), and we find that the Supreme Court of that state, in Funk v. Stevens, 169 N. W. 6, has said:

"The power to enact by-laws is an inherent and continuous one. The duly authorized representatives of the members are alone vested with the power of determining when a change is demanded, and the courts will interfere only when there is an abuse of discretion."

And in Hall v. Western Travelers Acc. Ass'n, 96 N. W. 170, the same court held that:

"A member of a mutual insurance company, who accepts membership subject to such provisions of the constitution as are then in force or may be thereafter adopted, is bound by a reasonable amendment to the constitution subsequently adopted.

"Such companies are self-governing bodies and courts will interfere in case of amendments to their constitution only when the amendment is unfair, operates oppressively, or to the disturbance of vested rights. Amendments which do not thus operate are not unreasonable."

Was the amendment fair and reasonable? In answering this question it must be borne in mind that the defendant, under the evidence, is a fraternal beneficiary association, has no capital stock, and transacts business without profit for the sole benefit of its members and their beneficiaries. Some of its objects are to provide funds for the relief of its members and pay therefrom the death benefits contemplated by the members upon joining the association. It is governed by a constitution, laws and by-laws and all amendments thereto, which the member agrees shall be a part of his contract. Under such an agreement it is patent that there are advantages to the member among which is cheaper insurance, and possibly some disadvantages, with which, however, he is by his contract fully advised, and which he accepts, and one of these is that its constitution and laws, under his agreement with the association, may be amended, and as amended shall continue to be a part of his insurance contract, provided, of course, that such an amendment is fair and reasonable and not against public policy and does not disturb any vested right. Hines

v. Modern Woodmen of America, 41 Okla. 135, 137 P. 675.

It is also evident that such rules as the eyewitness clause were adopted as the result of and based upon past experience, with a view and intention of minimizing the chances of being compelled to pay double indemnity in those cases where there might be some question as to the accidental nature of the cause of death, and that such rules, including the clause in question, were considered in the light of past experience in computing the cost of such insurance to the member; and it being a matter of contract the member is presumed to know all such facts when he becomes a member of such association. Taking all this into consideration, we conclude that such an amendment, that is, the eyewitness clause, is fair and reasonable, and not against public policy and does not interfere with any vested right under the contract. In support of our conclusion we quote from Roeh v. Business Men's Protective Association, 164 Ia. 199, 145 N. W. 479, 51 L. R. A. (N. S.) 221, which involved pratically an identical provision:

"It does not in any manner deprive courts of their jurisdiction but simply provides a rule of evidence or a condition precedent or subsequent to a right of recovery. We see nothing in the by-law contrary to public policy. Contracts relating to procedure have frequently been sustained. The parties may, by contract, fix their own statute of limitations. See Harrison v. Hartford Ins. Co., 102 Iowa, 112, 47 L. R. A. 709, 71 N. W. 220. They may also specify the terms and conditions of liability, even though without the contract recovery might be had. Griswold v. Illinois, C. R. Co., 90 Iowa, 265, 24 L. R. A. 647, 57 N. W. 843. A contract may be made waiving a jury trial. Bank of Columbia v. Okely, 4 Wheat, 235, 4 L. Ed. 559. A by-law much like the one now before us was applied in National Acci. Soc. v. Ralstin, supra; Kelly v. Supreme Council, C. M. B. A., 46 App. Div. 79, 61 N. Y. Supp. 394. A contract providing a rule of evidence was also upheld by this court in Russ v. The War Eagle, 14 Iowa, 363."

See, also, Lundberg v. Interstate Business Men's Acc. Ass'n (Wis.) 156 N. W. 482, and Moses v. Illinois Commercial Men's Ass'n 189 Ill. App. 440, cited in the note in L. R. A. 1918F, 420; and, also, Schumacher v. National Travelers Benefit Ass'n (Kan.) 235 P. 844; Becker v. Interstate Business Men's Acc. Ass'n, 265 Fed. 510, all of which cases hold that such a clause as we have here is valid and not against public policy.

In so far as the Michelin Case, supra, is in conflict with the rule as above expressed, the same is hereby overruled, as it is quite evident that the rule therein announced is no longer the law in this jurisdiction.

Having thus disposed of the validity of the clause in question, we next direct our attention to the evidence to ascertain if the plaintiff has complied therewith. As heretofore stated in this opinion, she takes the position that such clause has been construed to mean that there need not necessarily be an eyewitness to the actual shooting. We think the authorities support this contention, but it is necessary that such authorities be examined to some extent in order that the exact rule be ascertained and applied.

In 1 C. J. 508, cited in plaintiff's brief, the rule is thus stated:

"A provision that the facts and circumstances of an accident or injury must be established by the testimony of an actual eyewitness, in order to warrant a recovery of the whole indemnity provided for by the policy, does not require the testimony of a person other than the insured, in case of a nonfatal accident, or require, in the case of an accident by shooting, that any person should have actually seen the load leave the discharged gun; nor, in case of drowning, does it require that an eyewitness should have actually seen the insured fall into the water."

Counsel for plaintiff cites also Preferred Accident Insurance Company of New York v. Barker, 93 Fed. 158. That case involved a clause requiring the claimant "to furnish direct and positive proof that the death resulted proximately and solely from accidental causes." The so-called eyewitness clause was not in the case. The court held that under the clause in the policy, the testimony of eyewitnesses to the death is not required where there was no witness, "but the furnishing of such circumstantial evidence as was afterwards sufficient to satisfy a jury that the death resulted from one of the causes insured against must be deemed to have been a sufficient compliance with the requirement." In that case the evidence showed that the deceased went duck hunting in a boat, and that evening was found dead, standing in mud and water up above his knees, leaning across the boat and grasping bunches of grass growing near the shore. The ducks he had shot, the decoys, his coat and other articles were arranged in the boat. It was very cold and had been raining. He was lifted out with considerable difficulty although he weighed only 120 pounds. There were no marks of violence and a doctor testified that the de-

ceased came to his death from exposure as the result of being "bogged up" and unable to extricate himself. It will be noted that the evidence bore out the theory of accidental death. In fact, it would seem that no one could come to any other conclusion than that the death was accidental. The court said:

"* * * But there are other evidences than the testimony of eyewitnesses that can properly be considered, and, if the jury find them satisfactory and convincing, they are direct and positive enough to sustain the verdict. The previous good health of the deceased, the condition of the body when found, the depth of mud and water in which he died, the difficulty of removing the body from the bog, the position and contents of the boat, and the character and temperature of the weather, were important facts. * * *"

In Lewis v. Brotherhood Acc. Co. (Mass.) 79 N. E. 802, also cited by the plaintiff, the insured and a woman companion were seen rowing in a canoe within five minutes before it was found overturned with their bodies under water. The canoe was "cranky," that is, liable to overturn at any moment unless unusual care was exercised. We quote from the opinion:

"The jury might have found on the evidence of actual eyewitnesses that shortly before the time when the accident happened Lewis and Miss Hurley were upon the river in what might be called a 'cranky' canoe, liable to overturn at any moment unless unusual care was exercised by both Lewis and his companion; that within five (perhaps fewer) minutes of the time at which they were last seen alive the canoe was overturned and the bodies were under water. Here then is shown upon the testimony of eyewitnesses an operating cause,—namely, the imminent liability of the capsizing of the canoe by reason of its unusually cranky nature, taken in connection with the fact that it had two occupants of whom one was a young woman not shown to have been experienced in aiding to keep the canoe in balance. It is not the case of a boat which is of such size and construction as to be not liable to be upset by the movements of persons in it, but it is the case of a cranky canoe having two persons in it where a not unusual movement, even of one of them, may result in the capsizing of it. An operating cause for disaster is ever present under such circumstances, and that cause is disclosed by the testimony of eyewitnesses. Moreover, upon the evidence the jury might have found that the movements of the canoe and its occupants were shown by eyewitnesses up to a time within three or four minutes of the accident, and that every operating cause of the accident except the one above shown to have been present was

fairly excluded by the testimony of these same eyewitnesses. It must be held that in the case before us the facts and circumstances of the accident and injury were established by eyewitnesses within the meaning of the policy."

The case of Illis v. Interstate Business Men's Acc. Ass'n (Iowa) 168 N. W. 212, is to the same effect. The deceased was working in his garage and a rifle on a shelf was discharged and he was fatally wounded. The gun was very light on the trigger and the safety catch easily moved. Some rags and tools, including a grease gun, were on top of it. He ran into his home and said that he reached for the grease gun and something hit him. The gun was found on the shelf, a smoking rag with a hole burned through it over the muzzle. It was evident that he reached for the grease gun and accidentally moved the rifle and it was discharged. His acts were inconsistent with suicide. The court held (the provision involved being almost identical) that this evidence satisfied such provision, and cited Roeh v. Business Men's Protective Ass'n, supra, wherein the court used the following language:

"The event referred to in the by-law relied upon is manifestly death resulting from a bodily injury caused by the discharge of firearms, and provides that the independent testimony should come from one who was an eyewitness of that event. * * * Not only is the beneficiary to prove the operating cause of death, as that it was from a gunshot wound, but he must prove from an eyewitness of the event that the gun was accidently discharged. It is not enough that he prove that it might have been so committed. His proof must be stronger than that, and fairly preponderate in favor of the proposition that the gun was accidently discharged. * * * In the case at bar, the event, that is to say, the accidental character of the discharge of firearms resulting in death, must be established by at least one person other than the insured, and 'who was an eyewitness' does not necessarily mean that the witness should have seen the exact manner of the discharge; but it seems to us that it does comprehend the presence of the witness at or near the scene, and his direct observation of such facts and circumstances connected with the immediate transaction, as of themselves, and without any aid from presumption or inference arising from love of life, or the instincts of self-preservation, indicate that the shooting was accidental."

—and concluded by repeating the principle adopted and announced in the Roeh Case, viz.:

"Enough must be testified to by eyewit-

nesses to show the operating cause of the injury, or at least to show that at the time of the injury there was an operating cause to which the accident may fairly be attributed, and to indicate in a general way the nature of that cause and the manner of its working."

In the case at bar, after diligent search, we are unable to find any proof that can be construed to "fairly preponderate in favor of the proposition that the gun was accidentally discharged." We can find no facts or circumstances in the record indicating an accident, to the exclusion of every other theory. Possibly it was an accident, but the mere possibility is not sufficient. "It is not enough that he prove that it might have been so committed." As we view it, the evidence might show self-destruction as well as accidental death. In fact, there are some meager circumstances that might in the minds of some point toward suicide. For example, the fact that the deceased, the manager of a lumber yard, remained at home all afternoon, although in good health and for no reason unless it was to be company for a boy too sick to go to school and entertain him by playing dominoes with him, apparently leaving no one in charge of his business, might be treated as a rather unusual circumstance in the absence of evidence to the contrary. We are not unmindful of the presumption against self-destruction, but that rule of law is subject to the contract entered into by and between the deceased and the defendant company, and such presumption cannot change the contractual relation made by such agreement. The question of suicide, however, is not in the case.

We, therefore, have to conclude from the record before us that there was no evidence sustaining plaintiff's theory of the case, that is, that there were witnesses whose evidence preponderates in favor of an accidental shooting. To hold otherwise would simply nullify the clause in question and make another and different contract, which this court should not and cannot do.

In view of our conclusion we deem it unnecessary to pass on the question of whether or not the plaintiff was estopped from asserting her claim to the double indemnity provided for in the certificate by reason of her accepting and indorsing the check for the face of the certificate, and we, therefore, do not pass thereon.

For the reasons given, the cause should be reversed, and it is so ordered.

The Supreme Court acknowledges the aid of Attorneys Robert Ray, Chas. W. Pennel, and Hayes McCoy in the preparation of this opinion. These attorneys constituted an advisory committee selected by the State Bar, appointed by the Judicial Council, and approved by the Supreme Court. After the analysis of law and facts was prepared by Mr. Ray and approved by Mr. Pennel and Mr. McCoy, the cause was assigned to a Justice of this court for examination and report to the court. Thereafter, upon consideration by a majority of the court, this opinion was adopted.

McNEILL, C. J., and BUSBY, PHELPS, CORN, and GIBSON, JJ., concur.