WILLSON ET AL., APPELLANTS, *v.* WOODMEN OF THE
WORLD, RESPONDENT.

(No. 7,609.)

(Submitted January 9, 1937.  Decided January 26, 1937.)

[64 Pac. (2d) 1064.]

32

*Mr. George Y. Patten,* for Appellants, submitted a brief, and argued the cause orally.

*Mr. I. W. Choate,* of *Loud & Choate,* and *Mr. John L. Schweigert,* the latter of the Bar of Denver, Colorado, for Respondent, submitted a brief, and argued the cause orally.

*Mr. Walter Aitken,* appearing as *Amicus Curiae,* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

Plaintiffs, as beneficiaries of a benefit certificate in the sum of $3,000 issued by defendant on the life of George D. Pease, now deceased, brought this action to recover the benefits provided therein. The cause was tried to the court sitting without a jury on an agreed statement of facts, Honorable R. E. McHugh, judge presiding. The issue between the parties was whether Mr. Pease was in good standing as a member of the association at the time of his death on October 25, 1934. The district court found in favor of the defendant, and the plaintiffs appealed from the judgment. The essential facts are these:

The defendant was incorporated as a nonprofit fraternal mutual benefit society in the state of Colorado on January 20, 1891. The certificate in question was issued in 1900 and Mr. Pease admittedly continued in good standing until June 1, 1929. The certificate contained a clause to the effect that it should not be in effect at any time when the member stood suspended and was not in good standing pursuant to the constitution and by-laws, then in force or thereafter regularly adopted and in force at the time of death. Under its constitution death claims were paid from a benefit fund maintained by assessments. The constitution at all times authorized the levying of multiple assessments when the funds available in the benefit fund were insufficient to pay all death claims. Members were required to pay monthly lodge dues to their local lodges, and, in addition, regular monthly assessments to pay

death claims. The regular monthly assessment chargeable to Mr. Pease was $2.35, plus local camp dues.

In April, 1928, the insurance commissioners of eight of the nine western states in which the defendant operates, including Montana, met in Boise, Idaho, and notified defendant that examination "disclosed a condition threatening perpetuation" of the association for which "there was urgent necessity for remedy," and recommended that suitable action be taken to place the society on an adequate rate basis under the American Experience or National Fraternal Congress Table of Mortality with interest assumption at not to exceed 4 per cent. per annum by placing all new members in a separate class under such rate basis, and granting all present members the opportunity to transfer to such class without medical examination, upon such rate basis applied to their attained ages, and separating the funds of such separate class. The society, acting on the direction of the insurance commissioners at its head camp session held in Oakland, California, in 1928, attempted to amend its constitution and by-laws. By this amendment it created what was known as the reserve division among its members. The new members admitted after September 1, 1928, would be issued benefit certificates in the reserve division with rates based on the American Experience Table of Mortality at attained ages upon admission. All existing members were permitted upon application to become members of the reserve division upon rates applicable at attained ages. All members who failed to transfer to the reserve division would remain in what was called the assessment division, and would be required to pay all death claims accruing among them as a group by extra or multiple monthly assessments. At the time of this purported amendment to its constitution and by-laws the society had about 135,000 members in good standing. It had outstanding liabilities represented by benefit certificates of about $220,000,000, and had a reserve fund of approximately $9,000,000. It was estimated at the Oakland camp session that between 80 and 85 per cent. of the total membership would

transfer into the reserve division. The society accordingly transferred for the benefit of members of that division approximately 82½ per cent. of the $9,000,000 in the reserve fund, leaving the balance to be applied to the benefit of members who remained in the assessment division. Between the time of the Oakland camp session and May, 1929, nearly 82,000 members of the association transferred into the reserve division. In May, 1929, an action was commenced in the district court of Denver, Colorado, entitled *John J. McCue* v. *Woodmen of the World,* to challenge the validity of the proceedings resulting in the purported change of the constitution and by-laws. In that action it was determined that the proceedings were ineffectual to change the constitution and by-laws for want of a showing that they were adopted by a two-thirds vote. On appeal to the supreme court of Colorado that court reached the same conclusion and affirmed the decree of the lower court in part (*Woodmen of the World* v. *McCue,* 88 Colo. 209, 294 Pac. 947). A petition for rehearing was filed requesting that the judgment be affirmed *in toto,* but this was denied.

In January, 1931, the defendant called a special meeting of the head camp to be held at Denver. The same delegates attended this session as attended the Oakland session. At this meeting the identical changes attempted to be made in the constitution and by-laws at the Oakland session were again re-enacted and made retroactive as of September 1, 1928. Mr. Pease had actual knowledge of all the proceedings taken at the January, 1931, meeting. Those members who had been issued certificates prior to September 1, 1928, and who had not surrendered them for reserve certificates were given four options, if exercised before May 31, 1931, namely: (1) To thereafter pay the increased monthly rate on such certificate, and thus maintain the same in force and effect for its full face amount; (2) to exchange the same for a certificate in the reserve division upon rates therefor at attained age under the American Experience Table of Mortality, with 4 per cent. interest assumption; or (3) to continue to pay the same monthly

amounts as they had been paying under such certificate and have the face amount thereof reduced to such proportionate amount as such payments would carry on the basis of the increased rates; or (4) to continue to pay the same monthly amounts they had been paying under such certificate and have an interest-bearing lien or loan impressed on the face amount thereof, reducing and equalizing the same proportionately to requirements under the aforesaid increased rate.

George D. Pease did not elect to transfer into the reserve division but remained in the assessment division, and he did not take advantage of any one of the options given. Multiple assessments were levied on all members remaining in the assessment division in June, 1929, and thereafter. Mr. Pease did not pay or offer to pay any of the multiple assessments. In June, 1929, and thereafter, he regularly tendered to the defendant the single assessment of $2.35, plus the local camp dues, until the time of his death, but these were never accepted by the defendant. The multiple assessments were levied against those only who remained in the assessment division and did not apply to those who had transferred to the reserve division. Those who transferred to the reserve division were required to, and did, pay much more monthly in the way of premiums or assessments than a single assessment would have been had they remained in the assessment division. Other facts were agreed to, but in the view we take of the case they need not be alluded to.

The main issue in the case is whether George D. Pease continued to be a member of the defendant association in good standing up to the time of his death. Plaintiffs contend that he did, and in support of their contention assert that all of the proceedings taken at the Denver convention were null and void, because the delegates who purported to represent the defendant at this session were not qualified to do so, for the reason that they were not at that time members of the defendant association in good standing. Their contention is based largely upon the decree entered by the district court of Colo-

rado in the *McCue Case*. That decree provided "that all new benefit certificates or insurance policies purporting to be issued by the Woodmen of the World under the alleged amendment alleged to have been adopted at said head camp session of the Woodmen of the World at Oakland, California, in June and July, 1928, are null and void and that there is in the Woodmen of the World no such class or division as the reserve division and that the members who have surrendered their old benefit certificates and received in exchange therefor new certificates or new insurance policies shall, if they desire to continue their membership, return said new certificates or new insurance policies and that there will be delivered back to them their former benefit certificates or duplicates."

Plaintiffs contend that since nearly all of the delegates who attended the Denver session were those who had transferred into the reserve division and had taken no steps as provided in the above decree to be reinstated as members of the association, they were not in good standing nor entitled to participate as delegates. The trial judge sustained defendant's objection to the introduction in evidence of a copy of the decree of the district court of Colorado in the *McCue Case*. This is assigned as error by the plaintiffs. We shall not discuss the question whether this decree should have been received in evidence. It is our view that even if the decree had been received, plaintiffs cannot prevail, and we shall therefore treat the case as if this decree had been received in evidence. In other words, it is our view that even if the court erred in excluding the McCue decree the error was harmless.

The findings and decree of the Colorado district court in the *McCue Case* consist of twenty-seven typewritten pages. After holding that the amendments adopted at the Oakland convention were not carried by a two-thirds vote, it gave detailed directions to the defendant Woodmen of the World as to what steps should be taken by it to attain the status it had before the attempted change. The design was to restore it and its members to exactly the same situation as if the change had

not been attempted. It commanded the association to report to the court within thirty days from the date of the decree how and in what manner the decree was carried out. The court expressly retained jurisdiction for the purpose of seeing that the decree was complied with. It expressly provided that nothing in the decree should prevent the defendant from calling and holding another regular or special camp session and amending its constitution and by-laws as it saw fit. The district court in the *McCue Case* had no right to make any determination as to what the 82,000 members who had transferred into the reserve division must do to retain their status as members of the association, they not being parties to that action. That court evidently realizing that fact merely gave directions in its decree as to steps that should be taken to have the records show who were members and who were not. It did not purport to find or adjudicate as to who, aside from the parties before it, were members. The failure on the part of the defendants in that action to carry out the directions of that decree could not possibly have effected the suspension of some 82,000 members, who were not parties and who had paid more to retain their memberships than the court held the plaintiffs were required to pay. As appears above, that case was appealed to the Colorado supreme court, and it likewise held that the attempted amendment was a nullity, because it was not shown to have received the necessary two-thirds vote of the delegates. That court then said: ''The decree of the district court, in effect, left the Woodmen of the World, and its membership in the same condition and with the same rights and duties as though no amendment had been attempted. Only in so far as this decree effectuates this purpose, it is affirmed.'' (*Woodmen of the World* v. *McCue*, 88 Colo. 209, 294 Pac. 947, 954.) The supreme court of Colorado made it plain that all who had been members of the defendant association before the attempted change were still members, with the ''same rights and duties as though no amendment had been attempted.'' This conclusion is further fortified by the fact that on

motion for rehearing the supreme court of Colorado was asked to affirm the decree of the district court *in toto,* which motion was denied. The refusal of the supreme court to go the rest of the way with the trial court was tantamount to a reversal in those respects as to which it did not expressly affirm. (Cf. *Spitzley* v. *Garrison,* 208 Mich. 50, 175 N. W. 390; *Gudmundson* v. *Commercial Bank & Trust Co.,* 160 Wash. 489, 295 Pac. 167.)

The delegates to the Denver convention, as above stated, were also delegates to the Oakland convention. Though most of them, after the Oakland convention, had transferred to the reserve division, the result of the *McCue Case* was to place them in the same situation as before the attempted change made at Oakland, and we believe with the same rights as they possessed before the attempted change, one of which was to act as delegates to the head camp sessions, with power, on a proper vote, to change the constitution and by-laws.

Whether Mr. Pease, under the McCue decision, was reinstated as a member of the defendant association, and remained so by offer to pay the single assessment until the Denver meeting, we need not determine. Certainly, from and after the meeting in Denver he became subject to the multiple assessments which, confessedly, he never paid or offered to pay. He then ceased to be a member of the association. This result follows even though defendant did not take formal action notifying him of his suspension after the Denver convention. As a member of the association he was chargeable with knowledge of the fact that suspension follows the nonpayment of assessments. Moreover, he knew at all times that he was not recognized as a member of defendant association, because his tendered payments were never accepted. It is admitted that he knew of the Denver proceedings. He must be held to have taken his chances on the tenders he made, at all times up to the time of his death. If they were inadequate, he was chargeable with knowledge of the consequence (*White* v. *Wood-*

*men of the World,* 87 Utah, 477, 50 Pac. (2d) 422, 423), and particularly of his suspension.

That the defendant had the right to increase its rates and ▉ to provide for multiple assessments has been definitely held by the supreme court of Colorado, in *Woodmen of the World* v. *Lamson,* 97 Colo. 136, 47 Pac. (2d) 399. This holding by the courts of the domicile of the association is binding upon citizens of other states who are members of the association. (*Modern Woodmen of America* v. *Mixer,* 267 U. S. 544, 45 Sup. Ct. 389, 69 L. Ed. 783, 41 A. L. R. 1384; *Sovereign Camp, W. O. W.,* v. *Smith,* 176 Okl. 545, 56 Pac. (2d) 408.)

A case practically identical with this is that of *White* v. *Woodmen of the World,* supra. In that case White died September 2, 1932, after the Denver meeting. He had paid single assessments to and including June, 1929, but failed to pay multiple assessments levied in May and June. He tendered the regular single assessment for July and August, 1929, which was refused. No other payments or tenders were made by him. But the court in that case said: "He was not obliged to continue his tender of the single assessments because the association definitely refused to accept them unless accompanied by the extra assessments." Thus the case is exactly the same as if he had done as Mr. Pease did, i. e., continued making tender of the single assessments. The court, after referring to the *McCue* and the *Lamson Cases,* supra, said: "The decision of the court of the domicile of defendant corporation is decisive on the question of its power to levy the multiple assessments therein passed on." The court held in that case that the beneficiary had no right to recover under the circumstances, which were practically identical with those here. It held that White's membership terminated by not exercising one of the options available to all who had certificates issued prior to September 1, 1928, and who had not transferred into the reserve division.

Plaintiffs rely strongly on the case of *Lawson* v. *Woodmen of the World,* (Utah) 53 Pac. (2d) 432, 435. That was an action

to recover multiple assessments which had been paid. There were four different groups of claimants. Only one group was allowed to recover. In that group were the claims of four different persons. These four persons did not transfer to the reserve division. They had paid some multiple assessments and dropped out of the association in 1929. Recovery was sought of the multiple assessments paid by them. In reciting the facts in that case the court said: "Until April 25, 1929, only the regular assessments had been levied on the holders of benefit certificates who did not exchange their certificates or transfer to the Reserve Division. In May, 1929, one regular and four extra assessments were levied, which were paid by all four of these members; in June, 1929, one regular and five extra assessments were levied, which all four paid; in July, 1929, one regular and ten extra assessments were levied, which the McCoards paid, but Welmer and Thompson refused to pay and lapsed their certificates; in August there were one regular and ten extra assessments, and the same in September, when the McCoards quit paying and lapsed out." Obviously, under the McCue decision, those multiple assessments were not legally made, their necessity being occasioned in large part by the creation of the reserve division held to be a nullity, and were properly held to be recoverable, the claimants themselves not desiring to continue their memberships. Neither the court's decision nor any action taken by the head camp could make them members against their will. They were properly allowed to recover the multiple assessments held illegal by the *McCue Case.*

In discussing another group of claims in the *Lawson Case,* supra, the court made this statement: "Here the certificates in question were lapsed and nonexistent as contracts or policies of insurance before the curative act of 1931. When the Special Head Camp Session, 1931, made retroactive the amendments then adopted, and validated all existing contracts, neither the plaintiff nor his assignors could assert any rights under the certificates which had been issued; no rights could be preserved by the validating act because no rights under the certificates

then existed in anyone or could thereafter exist in anyone. These certificates, and any rights of the parties thereto, were the same before the validating act as after. No more rights could accrue or be asserted thereunder, and the certificates were given no force or effect by the action of the Special Head Camp Session of 1931. We must conclude, therefore, that the act of 1931, Special Head Camp Session, did not and could not affect these assignors or any claim they might have against the company for any past act, deed, or conduct." Undoubtedly this thought actuated the court in allowing recovery under group 4. This case does not aid plaintiffs here.

There is much discussion in the briefs on the part of plaintiffs that the defendant had no right to levy multiple assessments on only a portion of its membership. There is some language in the court's opinion in the *Lawson Case,* supra, that supports this view. However, as above pointed out, the Colorado courts, the courts of defendant's domicile, have sustained these multiple assessments, and we are constrained to follow their determination. Other courts have sustained similar changes. (Compare *Jenkins* v. *Talbot,* 338 Ill. 441, 170 N. E. 735, 80 A. L. R. 638.) This is not a case of a forced assessment upon some members that is not made applicable to others. Mr. Pease was given the same right or option that was given to every other member.

Plaintiffs also contend that defendant had no legal right to transfer a part of the surplus or reserve fund to the reserve division. What was said by the court in the *White Case,* supra, is applicable here. The court there said: "Counsel next argue that the assured's interest in the reserve or surplus funds of the association would carry substantial insurance, and if the association changed its plan, the assured was entitled in the way of insurance or cash to the benefit of such surplus. In support of this contention, plaintiff refers to the fact that if White had elected to make payment of the increased rates under either plan, the association would have allowed a monthly credit of $4.95 on account of such accumu-

lated surplus. The fallacy of this argument is that a member does not acquire any severable or proprietary right to any portion of the property of the organization as against the association itself. (19 R. C. L. 1267.) The property was subject to disposal by the association in accordance with its own laws and the law of the state. White could have obtained a proportional benefit from such accumulated fund had he chosen to remain a member and pay increased rates under either the old or new plan. This he did not do. The association not being in liquidation, its funds and property are not subject to distribution .to the membership. The effect of the allocative method was to give those continuing as members and paying the increased rates the benefit of reduction in the amount of such rates, the association at all times retaining and preserving the fund for the purposes for which it was collected, that of paying accruing death claims of members in good standing. It had a right so to do. (*Jenkins* v. *Talbot*, supra; 19 R. C. L. 1267.) The deceased could assert his interest in the fund only by remaining a member and meeting his obligations to the society in one of the ways provided by its laws.''

Lastly, it is contended that there was no necessity for levying the multiple assessments. On this point little need be said. In the case of *Woodmen of the World* v. *Lamson,* 97 Colo. 136, 47 Pac. (2d) 399, 401, the court said: ''The managing officers of the society in 1927 ascertained and determined that the rates then being paid for the insurance certificates were inadequate and insufficient to meet the accruing obligations of its members. Many members were of advanced age, mortality rates among the members were increasing rapidly and would continue to increase and it had therefore become necessary and imperative that the organization take proper steps to increase the amount of the payments and rates of its benefit members to prevent financial disaster and protect its future operations.''

In the *White Case,* supra, the supreme court of Utah said: ''When the insurance commissioners of the nine states wherein

the defendant did business were at the point of denying to the association the right of continuing in business unless it was placed in a solvent condition, an increase in rates and a change in policy were inevitable. There is no showing that the charges made were unnecessary, arbitrary, or unreasonable. The new plan was in harmony with the suggestions made by the insurance commissioners and was intended to place the association in a position where it could continue its existence on a sound financial basis.''

Here it was expressly agreed that on December 31, 1927, defendant was 46.1 per cent. solvent under its then existing rates computed upon actuarial standards of solvency as a life insuring institution, and that on December 31, 1928, it was only 32.8 per cent. solvent. We cannot say that the officers of the organization were not justified, under the circumstances, in levying multiple assessments.

The trial court correctly found for defendant, and the judgment is affirmed.

Mr. CHIEF JUSTICE SANDS and ASSOCIATE JUSTICES STEWART and ANDERSON concur.

Mr. JUSTICE MORRIS:

I dissent. The proceedings creating the reserve division of the defendant society, which, in effect, scuttled the assessment division, the conversion of approximately 83 per cent. of the reserve fund that had been built up under the old régime and to no portion of which the reserve division was entitled, after such division had abandoned the old and set up the new, are acts which may, in some degree, be mitigated by the alleged threatened bankruptcy, but cannot be justified upon any equitable grounds.