## No. 12,544.

WOODMEN OF THE WORLD ET AL. *v.* McCUE ET AL.

(294 Pac. 947)

Decided December 15, 1930.   Rehearing denied January 5, 1931.

Mr. GEORGE P. STEELE, for plaintiffs in error.

Mr. BENJAMIN C. HILLIARD, Mr. HORACE N. HAWKINS, Mr. BENJAMIN C. HILLIARD, JR., Mr. GEORGE M. SULLIVAN, Mr. CHARLES F. REDDOCH, for defendants in error.

210

*En Banc.*

Mr. Justice Moore delivered the opinion of the court.

Parties are referred to as in the lower court.

This suit was instituted May 15, 1929, in the Denver district court by eight members of the Woodmen of the World, a fraternal benefit society, incorporated under the laws of Colorado, against that association and seven of its head officers to enjoin them from enforcing certain of its laws which operated to readjust and increase its rates and method of insurance. An injunctive decree was entered against the defendants to review which this writ is prosecuted.

The complaint as summarized in the brief of plaintiffs in error charges: "That such provisions were the consummation of an unlawful, fraudulent and wicked scheme, secretly concocted by the defendant officers for the purpose of changing the institution from a fraternal association on the assessment plan to an old-line insurance company; that they formed a scheme to compel and drive the membership by arbitrary and illegal methods and coercion into surrendering their benefit certificates and accepting old-line insurance policies; that the scheme and conspiracy was put through at a legislative session of the corporation, held in June of 1928, under the guise of amendments to the Constitution; that prior to that session the officers had wrongfully dissipated and depleted trust funds; that since the session, and still in furtherance of such scheme, they had unlawfully and wrongfully allocated millions of dollars to certain classes of the membership and were misappropriating and depleting funds which had been built up through the assessment plan; that none of such amendments were legally adopted.".

A temporary injunction was issued, whereupon the defendants, appearing specially, sought to have the case dismissed on the ground that the plaintiffs had no right

to institute the suit, claiming that the Colorado statutes require such an action to be brought by the attorney general. The lower court held that the plaintiffs had capacity to sue and that it had jurisdiction to hear and determine the matter. Defendants then petitioned this court for a writ of prohibition against the district court, which was denied. Defendants answered specifically denying all charges of fraud and mismanagement alleged in the complaint and asserted that the amendments objected to had been legally adopted. The district court found that said amendments had not been legally adopted and entered its injunctive order, the effect of which was to maintain the status quo of the organization as of June, 1928.

The record is exceedingly voluminous, consisting of 6327 folios and numerous exhibits. We have read and considered the same with painstaking care, but in our opinion it is only necessary to recite such portions thereof as are pertinent to this decision.

The solution of two questions is determinative of the case: 1. Did the plaintiffs have capacity to sue? 2. Were the amendments objected to legally adopted?

1. Section 2624, C. L. of 1921: "The commissioner of insurance, or any person he may appoint, shall have the power of visitation and examination into the affairs of any domestic society. He may employ assistants for the purpose of such examination, and he, or any person he may appoint, shall have free access to all the books, papers and documents that relate to the business of the society and may summon and qualify as witness under oath and examine its officers, agents and employes or other persons in relation to the affairs, transactions and condition of the society. The expense of such examination shall be paid by the society examined, upon statement furnished by the commissioner of insurance, and the examination shall be made at least once in three years. Whenever after examination the commissioner of insurance is satisfied that any domestic society has failed

to comply with any provisions of this act, or is exceeding its powers, or is not carrying out its contracts in good faith, or is transacting business fraudulently, or whenever any domestic society, after the existence of one year or more, shall have a membership of less than four hundred (or shall determine to discontinue business), the commissioner of insurance may present the facts relating thereto to the attorney general, who shall, if he deem the circumstances warrant, commence an action in quo warranto in a court of competent jurisdiction, and such court shall thereupon notify the officers of such society of a hearing, and if it shall then appear that such society should be closed, said society shall be enjoined from carrying on any further business and some person shall be appointed receiver of such society, and shall proceed at once to take possession of the books, papers, moneys and other assets of the society and shall forthwith, under the direction of the court, proceed to close the affairs of the society and to distribute its funds to those entitled thereto. No such proceedings shall be commenced by the attorney general against any such society until after notice has been duly served on the chief executive officers of the society and a reasonable opportunity given to it, on a date to be named in said notice, to show cause why such proceedings should not be commenced.''

Section 2625, C. L. of 1921: ''No application for injunction against or proceedings for the dissolution of or the appointment of a receiver for any such domestic society or branch thereof shall be entertained by any court in this state unless the same is made by the attorney general.''

Concededly, in the absence of these statutory provisions, any aggrieved member of a fraternal benefit society has the right to bring a suit in equity such as here involved. Defendants urge that by virtue of the foregoing sections plaintiffs were denied the right to prosecute this action. Plaintiffs contend that this construction would make said sections unconstitutional because deny-

ing due process of law. Our construction thereof avoids the necessity of determining their constitutionality.

Section 2624 relates solely to the method of procedure in winding up the affairs of a domestic society. Section 2625 provides that the attorney general is the only one authorized to make application for injunction against any "such" domestic society. If we eliminate the word "such" before domestic society in section 2625, possibly the construction contended for by the plaintiffs in error could be maintained. However, it is elementary that every word of a legislative enactment must be considered and effect be given thereto. The two sections should be construed together because if we construed the latter alone, said word "such" would be meaningless. We must look to section 2624 to determine its construction. By virtue of section 2624, a quo warranto suit is authorized upon the happening of certain events therein mentioned. The court is empowered to dissolve an association "if it shall then appear that such society should be closed." The word "such" so used refers to a domestic association in process of dissolution. It further provides that "said society shall be enjoined from carrying on any further business and some person shall be appointed receiver of such society." Again it appears that the word "such" refers to a domestic society about to be terminated. Further, it provides that "No such proceedings shall be commenced by the attorney general against any such society until after notice * * *." Again the word "such" refers to an association about to be wound up.

We therefore conclude that the expression "such domestic society" in section 2625 means a society about to be dissolved, and that the attorney general is the only one authorized to maintain an injunctive suit against a society in such condition. The purpose of the instant suit was not to dissolve a defunct corporation, but to enjoin the alleged illegal actions of the officers of a solvent society. Said sections are therefore not con-

trolling of the plaintiffs' right to maintain the action here involved and the court had jurisdiction to hear and determine this case.

Our conclusion is fortified by the case of *McCall v. Grand Lodge Knights of Pythias,* 217 Ala. 194, 115 So. 254, which is the only case cited by counsel involving the identical point here determined. In this case the attorney general brought a suit, similar to the one here involved, against the Knights of Pythias. The defendants appeared specially to interpose a plea to the jurisdiction of the court, the contention being that, if the proceeding rests upon the provisions of sections 8495-8498 of the Code of 1923 (said sections being similar to section 2625, supra), a report and recommendation by the superintendent of insurance to the attorney general is a condition precedent, and a further plea to the effect that the attorney general was without interest in the subject-matter, and had no authority in any event to institute a suit of this character. In determining that the attorney general could not maintain this character of action, the court said at page 195:

"We are of the opinion the above noted sections 8495-8497 are without application to this bill. These sections look to quo warranto proceedings leading to a final dissolution of the order and a closing up of its affairs. Such is not the purpose of this proceeding. Its object is the protection and preservation of a trust fund, which is being depleted and dissipated fraudulently and wrongfully, to the irreparable injury of policyholders who have a property right interest in such funds. Very clearly, a policyholder under these circumstances has the right to invoke equity's jurisdiction for the protection of trust funds, and may maintain a bill of this character:" Citing cases.

"In such a proceeding the policyholder would not seek a dissolution of the order, but that a court of equity, through the appointment of a receiver, take charge to prevent a further misappropriation and waste of the trust

fund and protect the same, to the end that the defendant order and endowment department might continue to function, and be carried on as a 'going concern,' and the contracts of insurance should be upon a sound financial basis, and 'executed in their fullest integrity.'

"The bill was filed in the name of, and by, the Attorney General, evidently out of regard to the language of section 8498, Code of 1923, which reads as follows:

" 'No application for injunction against, or proceedings for the dissolution of, or the appointment of a receiver for any such domestic society or branch thereof shall be entertained by any court in this State, unless the same is made by the Attorney General.'

"Confessedly, this language, standing alone, is broad and comprehensive, but it must be construed in view of its relation to the context. The statutory provisions constitute but a codification of the Act of April 24, 1911, p. 700, these particular provisions being found in sections 24 and 25 of said act, and bearing the same relation therein as found in the present Code. It will be noted that the preceding provisions of the Code, just as in the original act, authorize both injunctive proceedings and appointment of receivers, and section 8498, in restricting such application to the office of the Attorney General, clearly to our minds had reference to the quo warranto and dissolution proceeding provided for in the preceding sections. We are of the opinion it was not the legislative purpose to attempt any restriction upon the right of a policyholder, having so vital an interest in the subject-matter, to go into a court of equity and seek preservation of such interest and a protection of the trust funds under the well recognized doctrine of the authorities noted. That right exists and continues in the policyholders, and these statutory provisions were intended in no manner to affect or restrict the same.

"So construing section 8498 in connection with the preceding sections of the Code, therefore, it appears these statutes are without influence upon a case of this char-

acter, and that litigation as to the matters set up in the bill is open to any aggrieved policyholder, and without regard to participation on the part of any state official.

"It results, therefore, as our view, that this bill cannot be maintained by the Attorney General, and that the plea to the jurisdiction was properly sustained."

Defendants in support of their contention that plaintiffs have no capacity to sue, cite the following cases: *Albach v. Fraternal Aid Union,* 100 Kan. 511, 164 Pac. 1065; *Cavlovic v. Croatian Beneficiary Association,* 117 Kan. 545, 232 Pac. 598; *Lowery v. State Life Ins. Co.,* 153 Ind. 100, 54 N. E. 442; *Baird v. The Modern Samaritan,* 162 Minn. 274, 202 N. W. 498; *Delaney v. Grand Lodge,* 244 Mass. 556, 138 N. E. 918; *McGarry v. Lentz,* 13 Fed. (2d) 51; *Cummings v. Supreme Council of Royal Arcanum,* 247 Fed. 992. In each of these cases, except one, decisions were made under statutes differing materially from the sections here under consideration.

*Albach v. Fraternal Aid Union, supra.* In this case a fraternal insurance corporation of Kansas and another of Colorado effected a merger pursuant to the statutes of Kansas and Colorado under the supervision of the insurance departments of both states and with their approval. Certain members and insurance certificate holders of the Kansas corporation filed an action charging irregularities in bringing about the merger, praying for the appointment of a receiver and for other relief. It was held that a member of a fraternal insurance association had no right to enjoin the legal acts of its governing bodies; that such an action can be maintained only by the attorney general. The statute involved was: "No injunction shall be granted by any court in this state against *any* association authorized to do business under this act, except on application of the attorney general, at the request of the superintendent of insurance." It is obvious that this statute is all comprehensive including all organizations doing business in Kansas, whether solvent or insolvent.

*Cavlovic v. Croatian Beneficiary Association, supra.* This case involves the construction of the identical statute involved in *Albach v. Fraternal Aid Union, supra,* and adopts the decision therein.

*Lowery v. State Life Ins. Co., supra.* Here it was held that a suit for injunction against an insurance company could not be maintained unless brought by the attorney general. The statute construed, provided: "No order, judgment or decree, providing for an accounting or enjoining, restraining or interfering with the prosecution of the business of any insurance corporation, association or society, organized or doing business under the provisions of this act, or appointing a temporary or permanent receiver thereof, shall be made or granted otherwise than upon the application of the Attorney General on his own motion, or after his approval of a request in writing therefor by the Auditor of State, except in an action by a judgment creditor or in proceedings supplementary to execution." This statute being much broader in its scope than the one here involved, the rule there announced is not here applicable.

*Baird v. Modern Samaritan, supra,* involved the construction of the following statute: "No action or proceedings to discontinue or enjoin, in whole or in part, the business or methods of any such domestic association, or to appoint a receiver therefor, or to dissolve the same, or in any manner affecting its corporate rights, except for failure to pay final judgment, or to oust any foreign association or enjoin it from transacting business in this state, shall be entertained by any court, except on the suit of the attorney general of this state." G. S. Minn. §3482. This is much broader and more comprehensive than the Colorado statute under consideration, because it denies not only the right of injunction against an association in process of dissolution, but also denies the right of a member to interfere "in whole or in part" with "the business or methods of any such domestic association."

*Delaney v. Grand Lodge, supra.* Here the court held that a member of an, association had no right to maintain an action seeking its dissolution. In so holding, the court said at page 566:

"So far as the plaintiffs seek relief against the corporation for exceeding its corporate powers and ask for the appointment of a receiver, for winding up its corporate activities and for cognate matters, they are precluded from invoking the aid of the court by G. L. c. 176, Sec. 36. It there is provided:

" '* * * No such proceeding shall be begun by the Attorney General until after notice has been duly served on the chief executive officers of the society by the commissioner and a reasonable opportunity given to it, on a date to be named in the notice, to show cause why such proceedings should not be begun, nor shall such proceedings be entertained, unless brought by the Attorney General.'

"This is but the re-enactment of earlier statutes in unmistakable words prohibiting proceedings for dissolution or the appointment of a receiver unless instituted by the Attorney General. See St. 1911, c. 628, Sec. 25."

*McGarry v. Lentz, supra.* Here, complainants, members of a fraternal benefit society, sought to enjoin it from proceeding with the purchase of land and the erection of a 30-story building thereon claimed to be solely for investment purposes and therefore in contravention of the laws of Ohio. The court held that the claimants could not maintain their action because of the Ohio statute which provided: "No application for injunction against or proceedings for the dissolution of or the appointment of a receiver for any such domestic society or branch thereof shall be entertained by any court in this state unless the same is made by the Attorney General."

The Code of Ohio, 1929, sections 9486 and 9487, with the exception that the word "superintendent" is used in

place of "commissioner," is identical to sections 2624 and 2625, C. L. of 1921.

We cannot agree with this decision, preferring to adhere to the reasoning set forth in the Alabama case, supra. In the Ohio case, supra, the effect and meaning of the word "such" was neither discussed nor determined, the court holding the language broad enough to include any fraternal organization.

*Cummings v. Supreme Council of Royal Arcanum, supra* (Federal district court of Massachusetts). This was a suit in equity by the members of a fraternal benefit society to close up its affairs, and the court held under the Massachusetts statutes that plaintiffs had no right to maintain the action. Since the character of the action there is dissimilar to that here involved, the decision is not here controlling.

2. Were the amendments objected to legally adopted?

The record discloses that on June 20, 1891, defendant organization was incorporated in Colorado as a fraternal benefit society to do business under the assessment plan; that the supreme authority of defendant corporation is vested in, and is exercised by, a representative body known as the head camp session, which consists of the delegates, the five members of the committee on legislation, the past head consuls and the nine elected or appointed head officers of the association. The delegates to the head camp session are elected by twenty-four districts, which are located respectively in the various states in which defendant corporation operates, namely, Colorado, California, Idaho, Montana, Nevada, Oregon, Utah, Washington and Wyoming. A regular meeting of the head camp session is held quadrenially. At such session, the nine elective officers of the defendant corporation, the past head consuls, the head officer, the general attorney and the five members of the committee on legislation are each entitled to one vote. Each district is entitled to elect one delegate and one alternate for each group of one thousand benefit members or major fraction thereof,

but in any event each district shall have at least one delegate irrespective of the number of benefit members in such district, and each delegate or his alternate so elected to the head camp session is entitled to one vote for each one hundred benefit members or major fraction thereof, represented by him.

From its incorporation until 1924, the association prospered and accumulated a large reserve fund. During the succeeding years, death claims increased, and in July, 1927, the claims exceeded the assessment revenues of that month. These claims were paid, not by double or multiple assessments for any month, which could have been made under the constitution of the order, but approximately $500,000 was authorized by the head officers to be paid therefor out of a guaranty fund created at the head camp session in 1924. On April 3 1928, the insurance commissioners of Colorado, California and Oregon made an examination of defendant's assets and reported that its condition was such as to make it imperative that some method be adopted increasing its rates, otherwise it could not be authorized to continue to do business, and suggested that the rates be changed by the association based upon either the ''National Fraternal Congress Table'' or the ''American Experience Table'' and that new members be placed in a separate class and required to pay adequate rates, and that old members be permitted to transfer into the new class without medical examination, and that contributions by the new class be kept separate. At that time the association had approximately 140,000 members. Thereafter the amendments to the constitution here involved, commonly designated article 11, were prepared and submitted to the regular head camp session in the afternoon of the sixth and next to the last day of its session, June 30, 1928.

Said amendments created a new class or ''reserve division'' effective September 1, 1928, members of which were required to pay rates based upon the American Experience Table of Mortality, being a considerably higher

rate than those theretofore existing. All new members could only enter the reserve division and privilege was given to old members prior to September 1, 1928, to transfer to the reserve division. Members not electing to so transfer remained in the old assessment division subject to extra or multiple assessments. An adjustment board was created consisting of the five head managers, the head consul, and the head clerk, who were authorized to adjust rates of assessment as to all members who did not transfer to the reserve division and to determine the allocation of funds and to enter into a contract to conduct the transfer work.

The total voting strength of said session was as follows:

| Head Officers and Districts | No. Delegates | Votes |
|---|---|---|
| Head officers | 14 | 14 |
| Committee on Legislation | 5 | 5 |
| District No. 1 | 10 | 105 |
| District No. 2 | 6 | 61 |
| District No. 3 | 5 | 45 |
| District No. 4 | 3 | 34 |
| District No. 5 | 3 | 29 |
| District No. 6 | 4 | 42 |
| District No. 7 | 1 | 7 |
| District No. 8 | 4 | 36 |
| District No. 9 | 12 | 121 |
| District No. 10 | 9 | 93 |
| District No. 11 | 11 | 110 |
| District No. 12 | 11 | 106 |
| District No. 13 | 6 | 56 |
| District No. 14 | 5 | 54 |
| District No. 15 | 3 | 28 |
| District No. 16 | 5 | 46 |
| District No. 17 | 11 | 107 |
| District No. 18 | 7 | 68 |
| District No. 19 | 2 | 19 |
| District No. 20 | 1 | 13 |

| | | |
|---|---:|---:|
| District No. 21........................ | 3 | 32 |
| District No. 22........................ | 1 | 15 |
| District No. 23........................ | 1 | 6 |
| District No. 24........................ | 12 | 24 |
| Total............................ | 155 | 1,376 |

Total Vote ........................................1,376
Majority Vote ................................. 689
Two-thirds Vote ............................... 918

Section 11 of article 3 of defendant's constitution of 1924 provides: "This Constitution may be amended by two-thirds of the votes of any regular or special Head Camp Session."

The evidence discloses, and the lower court found, that no record of proceedings of the head camp session as required by the constitution was kept. Two office stenographers of defendant organization, Jouno and Troncin, took shorthand notes of the meeting on the afternoon of June 30, an extension thereof disclosing:

"Head Banker Sunderland called the attention of the session to the fact that many of the delegates were anxious to get home, * * *

"Roll call of Head Officers and Delegates being taken showed sixty-six absent. Neighbor Hall rose to a point of information and asked 'What can we do without two-thirds present?' Many of the absentees came in. * * *

"Neighbor Burris designated General Attorney Steele as reading clerk to read and explain the proposition about to be read to the Session.

"General Attorney Steele then read the proposed amendment to the Constitution, to be Article eleven, as follows:
* * *

"Question was called for. Vote was taken. Head Consul declared that the amendment having received the necessary two-thirds vote, the Constitution is amended accordingly."

The undisputed evidence shows that the vote so taken was viva voce and that there were delegates who voted against said amendment. Testimony was conflicting as to the number of delegates actually in attendance at the time the vote was taken and how many voted for and against and how many did not vote. There was no roll call showing how many delegates were present at the time the vote was taken; how many and which delegates voted for or against the amendment. A purported record of the proceedings, defendant's Exhibit 2, recites: "Vote was taken and the Head Consul announced that the amendment having received the necessary two-thirds vote, the motion was carried and he declared the Constitution amended accordingly."

The lower court found:

"* * * that there was not two-thirds of the 155 delegates and officers present or voting upon the question of said amendments."

"* * * that the legal construction of said Section 11, Article 111, of the said Constitution of 1924, in the opinion of the court is that it required two-thirds of the 1,376 votes, which constituted the voting strength of said Oakland Head Camp Session; and the court finds that two-thirds of 1,376 votes is 918 votes, which was necessary to be cast in order to legally adopt the alleged amendments.

"The court finds that said alleged amendments were not carried by two-thirds of the 1,376 votes that the delegates and head officers were entitled to cast in said session as aforesaid."

Defendants contend that an affirmative vote of two-thirds of the delegates, a quorum being present, is sufficient to amend the constitution and that because the record of proceedings, defendant's Exhibit 2, shows the amendment legally adopted, its correctness cannot be questioned by other evidence. We are convinced that there was ample evidence to justify the determination of the district court that there was no record of proceedings

224

kept as required by defendant's constitution and therefore it was not only permissible, but absolutely necessary, to receive evidence showing what actually occurred. The testimony so received being conflicting, we are bound by the findings of the district court. However, in view of our construction of section 11, article 2, this finding may be ignored. In construing said section, a review of provisions of previous constitutions is helpful.

Division Q, section A of the constitution of defendant association, adopted in 1890, provides: ''These laws may be amended at any special or regular session of the Head Camp, by a two-thirds vote of the authorized delegates present, * * *.''

Article 26, section 1, constitution of 1892, provides: ''This constitution may be amended by a two-thirds vote of the Head Camp, or by a two-thirds vote of the Executive Council, when ratified by two-thirds of the Camps in the Jurisdiction.'' This identical section was readopted being article 38, section 1 of the constitution of 1894.

This provision remained in effect until August, 1900, when it was amended to read as follows: ''This Constitution may be amended by two-thirds vote of any regular Head Camp Session,'' and was readopted in 1902, being section 152 of the constitution of 1902.

So far as the record in this case discloses, this section remained the same until it was changed in 1920 as follows: ''This Constitution may be amended by two-thirds of the votes of any regular or special Head Camp Session.'' This last mentioned section was readopted in 1924, being section 11, article 2, of the constitution of 1924, and was the law which controlled the adoption of amendments during the head camp session of 1928.

It is clearly apparent that as these amendments were made from time to time the members of the association intended thereby to make it more difficult to adopt a constitutional amendment. Originally in 1890, all that was necessary was a two-thirds vote of the authorized dele-

gates present. In 1892, the requirement was restricted to a "two-thirds vote of the Head Camp." In 1902, a further limitation was provided, "two-thirds vote of any *regular* Head Camp Session," and in 1920 and 1924 the amendment here involved was adopted further limiting the power to amend by "two-thirds of the *votes* of any regular or special Head Camp Session."

If we should give effect to defendant's contention that the constitution may now be amended by a vote of two-thirds of the delegates, a quorum being present, we would be forced to conclude that section 11, article 2, 1924, though worded differently, was intended to be identical with division Q, section A, constitution of 1890.

Obviously a "two-thirds vote of the authorized delegates" does not mean "two-thirds of the votes of a regular or special Head Camp Session." If defendants be correct, then the vote of each delegate would have the same weight and effect, notwithstanding one might be entitled to one vote, another to ten and another to fifteen. In such case, a delegate would cease to have the full voting power and representation provided for in the constitution. Analyzing defendants' claim further, if the constitution authorized an amendment by a two-thirds vote of the delegates, a quorum being present, it was possible to amend the constitution by an affirmative vote of 52 delegates, 78, a quorum, being in attendance. Of the 52 (a bare one-third of those entitled to vote), 19 could be head officers and members of the legislative committee entitled to only one vote each. Most assuredly the constitutional provision is not susceptible of such construction.

It must be remembered that the government of the Woodmen of the World is functioned through delegates who are authorized to represent and vote in behalf of its membership, each delegate being entitled to cast one vote for every 100 members in his jurisdiction. A delegate has no power to represent his constituency except as such is granted by the articles of incorporation and

constitution of said organization. He may not waive the requirements of the constitution, because the absent members are entitled to the same degree of representation and protection as the delegates.

Having in mind the representative character of the delegates and their varying voting power, the provision "this constitution may be amended by two-thirds of the votes of any regular or special Head Camp Session" must be construed to mean exactly what it says—that an amendment may not be adopted unless two-thirds of the votes entitled to be cast at that head camp session are voted in favor thereof. The number of votes entitled to be cast at the 1928 session was 1,376. It was therefore necessary that 918 votes, being two-thirds thereof, be cast for the proposed amendment in order that it be legally adopted. Nowhere in the record is it shown that there were 918 votes or more cast for this amendment. Consequently, article 11, section 2, not being complied with, the amendment was not legally adopted and is a nullity. It was accordingly proper for the lower court to enjoin defendants from further proceeding thereunder.

The decree of the district court, in effect, left the Woodmen of the World and its membership in the same condition, and with the same rights and duties as though no amendment had been attempted. Only in so far as this decree effectuates this purpose, it is affirmed.

If deemed necessary, questions of the modification of the final decree of the trial court, in order that the same may be practically applicable to the present circumstances of the parties, may be further presented to this court upon petition for rehearing.

Mr. Justice Campbell not participating.