**WRIGHT et al. v. THE PRAETORIANS et al.**

No. 481.

District Court, N. D. Texas, Fort Worth Division.

March 23, 1943.

840

Smith, Holloway & Hudson and Chester Collins, all of Fort Worth, Tex., Julian B. Mastin, of Dallas, Tex., and Cantey, Hanger, McMahon, McKnight & Johnson, of Fort Worth, Tex., for plaintiffs.

James F. Gray, of Dallas, Tex., and Allen & Gambill, of Fort Worth, Tex., for defendants.

JAMES C. WILSON, District Judge.

The Praetorians is a fraternal benefit society incorporated under the laws of Texas. About nine nonresident policyholders in the defendant Company sue to recover something over $1,000,000 from its officers, for losses occasioned by their alleged fraud, mismanagement, etc. Also, they pray for an injunction and receivership. Expressly, the purpose is not a dissolution, but a rehabilitation of the Society, not that it is insolvent, but to save it from insolvency. To enable me to better visualize the magnitude of the suit and the possible scope of any receivership, defendant's counsel, at my request, have furnished me these facts, as reflected by the books of the Society. It was organized in 1898, does business in ten States, in addition to the home office at Dallas, Tex., has twenty-seven district offices with agents in charge, has one hundred and thirty-four officials in local lodges to write insurance on commissions. It has sixty officers and employees working in the office at Dallas. All told it has 55,636 members who have insurance. The insurance in effect is $61,050,930. Its assets, $10,768,120.14. Its annual dues aggregate something more than $1,000,000.

As to the kind of insurance business involved, the petition alleges: "The defendant The Praetorians currently issues term, ordinary, limited payment and endowment life contracts, providing for cash values, loan values, extended and paid up insurance, and since the date of its organization in 1898, has sold its policies under a general agency plan, with territories allotted to district or territorial managers, under general agency contracts. Sub-contracts are issued to agents or deputies, authorizing representation within general agency territories subject to the supervision of the district or territory managers."

The gravest charge is that the president, vice-president and other officers and representatives of the defendant delivered in cash and valuable properties, aggregating $2,960,978.48, to a man at Kansas City, for real estate mainly consisting of apartment houses, by which the Company lost $1,165,978.48; that this deal was consummated to defraud the Society and its policyholders. In this connection, the petition sets forth many specific acts of gross and wanton inefficiency, mismanagement and neglect, which contributed to this loss of over $1,000,000; that there have been many thefts and embezzlements committed by employees of the defendant society, totaling many thousands of dollars, all of which were protected by adequate bonds, which the individual defendants here have negligently failed to report to the surety company. It is alleged "that The Praetorians are now operating, and since the year 1928 has been

operating, under Article XXIV, Section 1, of their Charter and Constitution, which reads as follows:

"'Section 1. The funds of The Praetorians shall be as follows:
Benefit Fund Class A.
Mortuary and Reserve Fund B.
Mortuary and Reserve Fund C.
Mortuary and Reserve Fund D.
Mortuary and Reserve Fund Juvenile.
Expense Fund.'"

It then alleges what Benefit Fund Class A is to consist of, and what shall be credited to it, etc.; and that all benefits accruing to all policyholders under that class shall be paid out of that fund; that violations were committed in the matter of accounting to that fund, in failure to periodically value the fund, in failing to credit same with payments made to the insured of that class and in failing to charge proportionately deficiencies appearing in that fund against the policies of that class; that due to deficiencies in that fund death claims and benefits, properly payable out of that fund, have been paid out of other and different funds, all in violation of the Charter and Constitution; that the surplus of the Society has been reduced from $663,408 to a deficit, the amount of which plaintiffs are not sufficiently informed to plead; that in certain stated years the disbursements of the society have been several hundred thousand dollars greater than income; to meet such deficits that the officers have transferred funds from one class to another, all in violation of its Charter and Constitution, and of the laws of the State of Texas.

The petition, after alleging every conceivable violation of the laws of Texas, and the necessity, as well as the far reaching scope and beneficial results of injunctions and a receivership herein, alleges this (all italics mine):

"Your petitioners further *allege that the receiver, through the institution of appropriate suits* against parties liable to the defendant Society such as the non-resident Barney Goodman, and against others which an audit will reveal, can recover assets rightfully belonging to all members and policyholders which will cure and remove the presently existing impairment in the reserves, and will give full par value to the policies owned by the plaintiffs and all other members, and your *petitioners allege further that* unless a receiver is appointed, instead of the rehabilitation and restoration to solvency which by such appointment would accrue, *there is likely to be filed a dissolution proceeding by State officials, which suit, instead of rehabilitating, will destroy* and liquidate said Society and will seriously and adversely affect the property rights and interests of all members and policyholders, which can only be protected and saved through *the appointment of a receiver.*"

The prayer of the petition is as follows: "plaintiffs pray that the defendants be cited to appear and answer this petition, and that upon a final hearing hereof joint and several judgment be rendered against all individual defendants herein in the sum of $1,165,978.48; and for such additional amounts as may be found on trial to be due them; *that a receiver be appointed to exclusively operate, manage and control all corporate operations* and properties within the limits of the State of Texas; that said *receiver be vested with the exclusive corporation franchise of said corporation,* to be *operated by him and him alone,* under the orders of this Court, except for such agents, attorneys and employees as he may, in keeping with this Court's orders, appoint and designate, with sole and exclusive power in said receiver to institute, prosecute, defend and compromise, and file all answers and consents, in all causes of action, suits, and other legal proceedings in the courts of Texas, both state and federal; all subject to the orders of this Court; that the defendants, Tom L. McCullough, John N. Harris, John W. Payne, J. W. Randall, J. M. Mottley, B. S. Horton, R. E. Tarpley, J. W. Puckett, as directors of said corporation, and the defendants, Tom L. McCullough, John N. Harris, John W. Payne, J. W. Randall and W. L. McNeny, as the Society's officers and executive committee, and all other agents and employees, be divested of all powers and authorities to file, prosecute or defend, or to make answer, default or consent, to any action or suit involving the defendant Society, * * *; that said defendants, *in every capacity whatsoever, be enjoined and restrained from calling any corporate meeting whatsoever, whether for the purpose of electing a new board of directors, and for any other purpose,* and that said defendants be enjoined from in any way disturbing the possession, custody, management and control of said receiver, and that they be ordered, individually, as the board of directors, as officers, and as its executive committee, and

as agents and employees of said defendant Society, to deliver to said receiver any and all properties, of every kind and character whatsoever, within the confines of the State of Texas; that said defendant, individually, as directors, as officers, and as the executive committee and as agents and employees of the defendant society, *be restrained and enjoined* from making, closing and consummating any agreement having for its purpose the sale, transfer or conveyance of its assets to any person, corporation or concern, or a merger of the properties of the defendant The Praetorians with those of any person, corporation or concern, and that they, *in similar capacities be enjoined* from attempting to fix any charge and lien upon any of said defendant Society's policies, and from consummating, negotiating, selling, or in any way acting or attempting to do anything whereby the assets in whole or in part, of The Praetorians will be transferred, assigned, conveyed, underwritten, or alienated, to any person, corporation, or concern whatsoever; *that said receiver be directed* to have a full and complete audit of the corporate books and records made, extending over such period of time as to him should seem meet and proper; * * * *that a temporary restraining order be entered* on presentation of this petition, directing and instructing defendant The Praetorians, its officers, directors, agents and representatives, not to pay out any funds, and not to negotiate, sell, *reinsure, reissue, transfer, assign or convey,* to any person, corporation or concern whatsoever, *any policies* or assets belonging to said defendant Society; * * * *"

It will be readily seen from these cited and quoted allegations of the petition, if the Court granted the receivership, injunctions and restraining order prayed for, that it would have the effect to completely oust the present officials of the defendant Society, and prevent the election of others to take over their functions; likewise with power to discharge all of its present employees. It is apparent such injunctions would close out operations by the Society in every branch of its business. In short, it would constitute the Court, through such a receivership, the home office of this fraternal benefit Society, extending its functions, more or less, to ten states of the Union; that in order to make any attempt whatsoever to rehabilitate the Society that

it would be necessary for the Court, through its receiver and his agents and employees, to well nigh carry on the regular business of an insurance company, soliciting policies, writing insurance to build up the Society, and to last for a time, the length of which is not even remotely suggested in the plaintiffs' petition. At the same time and at all times, this Court so engaged in such business would be subject to the laws of the State of Texas, including supervision by the Board of Insurance Commissioners of Texas, through its constituted agencies. Confronted by this picture of the possible ramifications and conflicts and complications and duration of such a receivership, to say nothing of its very incongruity, it occurs to me if there is not a system of laws in Texas which forbids any court to entertain such a suit, at the instance of policyholders, that there should be. But it is my view that the laws of Texas very definitely deny such plaintiffs the right to file and maintain such a suit.

■ In the first place, it is conceded, and must be conceded, that the declared policy of the Legislature of Texas and its courts is, that such fraternal benefit societies are affected with a public interest. The Texas courts hold "that the business of insurance, however conducted, is quasi public in nature, and subject to regulation and control by the state". State v. Robinson, Tex.Civ.App., 42 S.W.2d 457, 458. Pursuant to such a policy, the Legislature of Texas has set up an elaborate system of laws, covering all insurance companies operating in this State, including fraternal benefit societies organized in, or out, of the State of Texas. All of those subjects are dealt with under Title 78 of the Revised Statutes of Texas, beginning with Article 4679 and ending with Article 5068. Article 4682 deals with the duties of the Commissioner of Insurance, among them, "shall execute the laws.—See that all laws respecting insurance and insurance companies are faithfully executed". As to insurance associations organized in Texas, and as relates to the power to bring such suits, the public policy of Texas was declared in Article 4691. After providing that the Commissioner should have full authority of visitation and examination of such companies, to be at their expense, paragraph 5 of such article provides as follows: "He shall also have power to institute suits and prosecutions, either by the

Attorney General or such other attorneys as the Attorney General may designate, for any violation of the law of this State relating to insurance. *No action shall be brought or maintained by any person* other than the Commissioner for closing up the affairs *or to enjoin, restrain or interfere with the prosecution of the business of any such insurance company* organized under the laws of this State."

The wisdom, the necessity as well, of such laws is apparent, without any elaboration.

In the body of those insurance laws, in articles 4852 and 4853, the Legislature dealt with like powers, as relates to fraternal benefit societies, such as The Praetorians. A construction of these articles governs the decision here. They are as follows:

"Art. 4852. Examination of domestic societies. The Commissioner or any person he may appoint, shall have the power of visitation and examination into the affairs of *any domestic society*. He may employ assistants for the purpose of such examination, and he, or any person he may appoint, shall have free access to all the books, papers and documents that relate to the business of *the society*, and may summon and qualify as witnesses under oath and examine its officers, agents and employés or other person in relation to the affairs, transactions and conditions of *the society*. The expense of such examination shall be paid by *the society* examined, upon statement furnished by the Commissioner, and the examination shall be made at least once in three years. Whenever after examination the Commissioner is satisfied that *any domestic society* has failed to comply with any provisions of this chapter, or is exceeding its powers, or is not carrying out its contracts in good faith, or is transacting business fraudulently; or whenever *any domestic society*, after the existence of one year or more, shall have a membership of less then four hundred, or shall determine to discontinue business, said Commissioner may present the facts relating thereto to the Attorney General, who shall, if he deem the circumstances warrant, commence an action in quo warranto in a court of competent jurisdiction, and if it shall then appear upon the trial that *such society* should be closed, *said society* shall be enjoined from carrying on any further business and some person shall be appointed receiver of *such society* and shall proceed at once to take possession of the books, papers, moneys and other assets of *the society*, and shall forthwith, under the direction of the court, proceed to close the affairs of *the society*, and to distribute its funds to those entitled thereto. No such proceedings shall be commenced by the Attorney General against any *such society* until after notice has been duly served on the chief executive officers of *the society* and a reasonable opportunity given to it, on a date named in said notice, to show cause why such proceeding should not be commenced."

"Art. 4853. Application for receiver, etc. No application for injunction against or proceedings for the dissolution of or the appointment of a receiver for *any such domestic society* or branch thereof shall be entertained by any court in the State unless the same is made by the Attorney General."

Under these statutes, which will be referred to as 52 and 53, the defendants presented a plea to the jurisdiction of this Court; the ground being that this suit, with the relief sought, is not maintainable by policyholders; that, as plaintiffs, under Texas law, they are incompetent to institute such a suit in any court; that the Attorney General of Texas, at the instance of the Insurance Commissioner, is the only one with such authority, and competent, to do so.

Plaintiffs reply that this is not a dissolution suit, but to rehabilitate The Praetorians; that the Attorney General only has the exclusive power to bring suits for dissolution of such domestic societies; that such Texas statutes only deny to plaintiffs the right to bring dissolution suits; that such power granted to the Attorney General, as to quo warranto proceedings, was not intended to be exclusive of their right, under the Constitution, to bring such a suit as this; that State legislation cannot control the jurisdiction of federal courts.

■ In passing, on the way to the main question, let me say this: what a plaintiff may name his suit, allegations as to what its effects are to be, or even what they are intended to be, are not binding on the courts; that plaintiffs call this a rehabilitation suit is not conclusive. Such allegations are merely conclusions. The Court may look to its essence, and to the obvious practical results the suit will have upon such a society. In State v. Robinson, supra (writ of error denied by the Supreme Court), in commenting further as to the effects of a receivership, of a Lloyds insurance association, organized under the laws of the State of Texas, the Court said: "it is evident that a receivership would practically end its business activities, discredit it as a business concern in the estimation of the public, effectually prevent or at least discourage efforts of underwriters to make good an impairment or insolvency, outstanding risks if not reinsured, would be canceled to the detriment of policyholders, securities held in the guaranty fund would at once be put in the melting pot for liquidation, at probable sacrifice, and, if the exigency demands, individual underwriters would be called upon at once to pay their notes held in the reserve." In the same case the Texas court quoted from Union Savings & Investment Co. v. District Court, 44 Utah 397, 140 P. 221,

Ann.Cas.1917A, 821, as follows: "Where, however, as here, the manifest purpose, and *the only possible result,* of the action is to wind up all of the business affairs of the association, and *the effect is necessarily* to dissolve its corporate existence, the action should be commenced by the Attorney General as pointed out in the statute." Nothing could be plainer to me, if this Court granted all of the relief here prayed for, that the certain result would be, if not instantly, to ultimately wind up the business affairs of this Association. A receivership here, to my view, would have all of the results the Texas court pointed out as, evidently, would flow from a receivership of a Lloyds insurance association. And there, the Court was dealing with an insolvent insurance association, and stressed that such a receivership would work against possible impairment of insolvency, in other words, rehabilitation. While here we are dealing with an association that has done business for forty-five years and is still abundantly solvent, the injunctions and receivership sought being largely due to an alleged unfortunate real estate deal and the improper application and use of certain funds.

The main proposition of plaintiffs is that, properly construed, Articles 52 and 53 do not deny them the right to file such an equity suit, with ancillary relief, such as injunctions, receiver, etc. They rely upon such cases as Woodmen of the World v. McCue, 88 Colo. 209, 294 P. 947, by the Supreme Court of Colorado, and like cases, such as McCall, Attorney General v. Lodge, 217 Ala. 194, 115 So. 254, and Grand Lodge, K. P. v. Shorter, 219 Ala. 293, 122 So. 36, and Union Savings & Investment Co. v. District Court, supra. Texas cases are also cited, but there are none deciding the question we have here. The McCue case, by the Supreme Court of Colorado, is the only one that will be discussed. It was brought by Colorado members of the Woodmen Society of Colorado. They sought only a temporary injunction. Though the facts were different, and the relief sought was little in scope to what it is here, the decision nevertheless sustains plaintiffs' construction of our Articles 52 and 53. The Acts construed by that Court, identical in language, were Colorado statutes, C. L. §§ 2624 and 2625. It was conceded there, as it is here, in the absence of some statutory prohibition, any member or policyholder of a society would be entitled to bring such a suit in equity. Plaintiffs' construction is taken almost verbatim from the Colorado decision, the material parts being:

"Section 2624 *relates solely to the method of procedure in winding up the affairs of a domestic society.* Section 2625 provides that the Attorney General is the only one authorized to make application for injunction against any 'such' domestic society. If we eliminate the word 'such' before domestic society in section 2625, *possibly* the construction contended for by the plaintiffs in error could be maintained. However, it is elementary that every word of a legislative enactment must be considered and effect be given thereto. The two sections should be construed together, because, if we construed the latter alone, said word 'such' would be meaningless. We must look to section 2624 to determine its construction. By virtue of section 2624, a quo warranto suit is authorized upon the happening of certain events therein mentioned. The court is empowered to dissolve an association 'if it shall then appear that such society should be closed.' The word *'such'* so used *refers to a domestic association in process of dissolution.* It further provides that 'said society shall be enjoined from carrying on any further business and some person shall be appointed receiver of such society.' Again it appears that the word *'such'* refers to a *domestic society about to be terminated.* Further, it provides that *'no such proceedings* shall be commenced by the attorney general against any *such society* until after notice. * * *' Again the word *'such' refers* to an association about *to be wound up.*

"We therefore conclude that the expression *'such domestic society' in section 2625 means a society about to be dissolved,* and that the Attorney General is the only one authorized to maintain an injunctive suit against a society in such condition. The purpose of the instant suit was not to dissolve a defunct corporation but to enjoin the alleged illegal actions of the officers of a solvent society. Said sections are therefore not controlling of the plaintiffs' right to maintain the action here involved, and the court had jurisdiction to hear and determine this case." [88 Colo. 209, 294 P. 949.]

That appears to be a very narrow construction and imputes a well nigh futile purpose to the Legislature. What the

Colorado court was trying to do, is what we are trying to do, get at the intent of the Legislature from the subject matter dealt with, and the words used, in these closely related statutes. In the first place, such a construction would be contrary to the declared public policy of Texas, in relation to kindred insurance associations. It is unmistakably clear that the State of Texas was, by these two Acts, taking over the supervision of, the control, and, when determined to be necessary, the dissolution of, any such domestic societies. Likewise, retaining for itself the exclusive power, through its designated agencies, to procure injunctions against, or receivership for, such societies. Great precaution was exercised, in regard to any and all such proceedings, against the possibility of injustice to such societies. In this connection, we get this from these articles themselves. For example, first, before there could be any injunction or receivership procured even in behalf of the State, it was necessary that such a domestic society undergo a thorough examination by the Insurance Commissioner. Even if that examination disclosed that such a society had failed to comply with the laws of the State, or for other reasons was subject to dissolution, it was nevertheless left to the discretion of the Insurance Commissioner, whether it should be proceeded against. But his decision to dissolve, if reached, is not sufficient. He must report his findings to the Attorney General, with the view of quo warranto proceedings. However, whether the Attorney General does so is likewise a matter in his discretion. On the other hand, if he decides to seek a dissolution, such decision is not enough. The Attorney General must give the society notice and a reasonable opportunity, at a named date, to appear and show cause to him, why such dissolution proceedings should not be commenced. If he then finally decides upon dissolution, the proceeding must be instituted in a court of competent jurisdiction and give the society the benefit of a trial before such court. It is only when that court has reached a decision that the society should be closed, that an injunction and receivership follows.

Bearing upon intent of the Legislature, in view of such extreme precautions against even state action, is it possible that the same Legislature would render futile that same protective system of laws, by grafting into same the right of any dis-

gruntled policyholder to go into a court, assuming otherwise it might have jurisdiction of such suits, and procure injunctions and a receivership, which would instantly have the effect to strike down the official family of any such society, with all of its employees, and thus put an end to all of its business functions? That is what plaintiffs would have us believe. Such a construction would leave these fraternal benefit societies subject to such destructive forces, while the same system of law obviates any such eventualities to insurance associations, in the business for gain. It is wholly inconsistent to impute to the Legislature of Texas any such intent. In view of such declared policy, it is the duty of this Court to uphold that policy, if it may do so by any reasonable construction of the words of this Act.

The Colorado court's decision was made solely on the meaning given to the word, "such", as used in the phrase, "any such domestic society" as it appears in line 4 of our article 53. It held it meant a society in the process of dissolution, because they were able to find in the preceding Section, our Article 52, line 31, the word "such" where it meant a domestic society "in process of dissolution". They said, *"the word 'such' so used refers to a domestic association in process of dissolution"*. On that basis they held that the sections, construed together, only forbids members, or policyholders, of such societies to file a dissolution suit, or for injunctions against, or receiverships of, a particular society, where it is already undergoing the statutory process of dissolution as authorized, and provided for, in the first section. Again, bearing upon intent, that holding attributes to the Legislature as a primary and only purpose to accomplish results, as reached in that construction, while, as a matter of fact, that was not its real objective, but was only incidental, for this reason: That first article provides such statutory proceeding for dissolution shall be filed in a court of competent jurisdiction. When such a court has assumed jurisdiction, and has decided the society should be closed, the injunction and receivership become mandatory upon the court. An application for either is not required. They must follow. When they do, they are about as sweeping in scope, as are sought here. The process of dissolution begins when the Attorney General files the suit. It is then, and not until then, the properties of the Society are construct-

ively in custodia legis. They are factually so when the injunction and receivership are in effect. The jurisdiction of such court becomes exclusive. Why should the Legislature in Article 53 have as its primary objective to provide that members and policyholders of such societies not have the right to file a suit for injunctions, or receivership, in other courts, only when such society was already undergoing the statutory process of dissolution, as provided for in Article 52? There is no law better known, or more universal in application, than the law with respect to conflicts of jurisdiction of courts, which, under such circumstances, denies to all persons the right to file, and all courts the right to entertain, such a suit, regardless of statute. The jurisdiction of the first court, certainly proceeding with this special statutory dissolution provided in Article 52, would be exclusive of the jurisdiction of all other courts.

■ For another reason, the purpose accorded to the Legislature, though not altogether aimless, still was not useful, in another respect. Where that court holds the word "such", in the last section, means a society "in process of dissolution," or "about to be dissolved", because they find a word "such" in the first section which means that, such court is bound to have had in mind, as a process, not a suit with similar purposes in equity, but this special statutory process of dissolution, exactly that provided in the first section; that is, that such parties as these plaintiffs could not file for that statutory process of dissolution, with mandatory injunctions, receiverships, etc. They are not named in Article 52 among those who can file it. Only the Attorney General is named. The maxim, expressio unius est exclusio alterius, never had more pertinent application than here. Since the Attorney General is named, they are excluded. Though not necessary, Article 53 makes it doubly sure by expressly excluding them from such dissolution proceedings. But they could not have brought it if Article 53 had not been passed. But that, with the Legislature, was not primary, but incidental. The real object of Article 53 was to deny to such plaintiffs the right to file equity suits, with ancillary relief, such as injunctions or receiverships. As long as they leave off such relief or dissolution, they are in no manner restrained in their constitutional rights to file suits, either in equity or law.

■ I construe Article 53 as meaning exactly what it says. It applies to all such fraternal benefit societies in existence, and doing business, in the State of Texas, including those of the classes dealt with in Article 52. This article merely provided that the Attorney General could file suits for dissolution against such societies. As stated, it did not expressly provide that private persons could not. Article 53 takes care of that by providing that no person, except the Attorney General, may file an application for dissolution, or for injunctions against, or receivership of, any such domestic society. To accomplish that was the intent of this article. Under it no application for either could be filed, regardless of the pendency of a statutory dissolution proceeding.

Article 53 had almost entirely different objectives from Article 52. In addition to the power delegated to the Attorney General to institute such suits, to the exclusion of all other persons, Article 53 dealt with injunctions and receiverships in suits in their customary sense, as ancillary to some major objective. Article 52 did not so deal with them. No application for either is provided for in that article. As stated they are made mandatory upon the court, following its decision that the society should be closed It does not provide for, nor does it contemplate, applications for either on the part of the Attorney General, or the Insurance Commissioner. A mere suggestion by the Attorney General or the Commissioner of the requirements of the statute would be all sufficient. They are so provided as being indispensable, to effectuate a winding up of the affairs of the society, ending in its dissolution. That such was the intention of the Legislature is supported by the very title of Article 53, which is, "Application for receiver, etc." Such title bears only the significance that the article is to deal with receiverships and similar relief, ancillary to a main suit.

The Colorado court apparently took the view that the first section dealt solely with the dissolution of such societies. It said, "Section 2624 relates solely to the method of procedure in winding up the affairs of a domestic society." The title to our Article 52 is, "Examination of domestic societies", nothing about dissolution. That is the article and the only one that clothed the Commissioner of Insurance with the power of visitation and examination of such societies, not less than once in three years, to be at

their expense. In that part of the article the Legislature was dealing with any and all such domestic societies. That examination was more to keep them in a healthy, sound state. It can be fairly assumed that of those so examined, few would be found to deserve dissolution; that a large majority would be discharged to continue their ordinary functions. There are a number of societies dealt with that fall in different classes, among them those to be dissolved. All of those found not to come in one of those classes, by implication, are permitted to continue their normal functions. It seems strained to hold that this Article deals only with such domestic societies as are subjected to the processes of dissolution.

Furthermore, to give the construction to the word "such", in the second article; a society "in the process of dissolution", because "such" is found in the first article where it means that, is too narrow and is untenable. For convenience, in reference, I have had the lines of our Texas statutes numbered. In line 4 of Article 52, "any domestic society" means any such fraternal benefit society in existence in Texas. In lines 8, 9, 12 and 14, "the society" means any such society being examined by the Commissioner. In line 18, "any domestic society" means any one in existence in Texas which has been subjected to the Commissioner's examination, and found wanting, in particulars there named. In lines 22 and 23, "any domestic society" means one that has been in existence a year or more with a membership of less than 400, also, any that have determined to discontinue business. In line 31 "such society", in line 32, "said society", in line 34, "such society", in lines 36 and 37, "the society", and in line 39, "the society", each mean a society that has been examined and where both the Commissioner and the Attorney General have exercised their discretion to proceed against, and where the court, after the trial, has decided should be closed. In line 42, "such society" and in line 44, "the society" mean one that has been examined by the Commissioner and reported to the Attorney General for dissolution, where he may or may not have decided upon dissolution, and in behalf of which he has given the required notice to show cause why the proceeding should not be commenced.

It will be noted in the first article, "the society", "said society" and "such society" are used interchangeably, with identical meaning. It follows the effects and construction of the Article would not be different, if "the" or "said" were used in lieu of "such", wherever it is used. If they had been so substituted, what would become of the Colorado court's construction? If they held the same, it would have to be on an arbitrary basis. Lastly, I would stress this: that "such society" in line 42 does not mean a society, against which dissolution had been finally determined upon by the only official who could institute it. The Court reckoned with that particular "such", and held it to mean a society "about to be wound up". Obviously it does not mean that. That was a mere potentiality. It was the common fallacy of assuming, where there was an investigation, there was a dissolution. If that is the true construction, the anomaly would be, how would a society, meeting plaintiffs, in a suit like this, show it was "about to be wound up", where it was then making its showing "why such proceeding should not be commenced", where the Attorney General is empowered to and might decide either way.

As stated heretofore, there are no Texas authorities that are exactly in point and controlling. If so, they would be followed, of course, since we are construing a Texas statute. We do have decisions by Federal courts of very high authority deciding the question, which I prefer to follow. They are directly in conflict with the Colorado Supreme Court decision. In fact, they were cited to the Colorado court, and were criticised by it in reaching the conclusion it did. They are such cases as Haynes v. Fraternal Aid Union et al., D.C., 34 F.2d 305; McGarry v. Lentz et al., D.C., 9 F.2d 680, affirmed 6 Cir., 13 F.2d 51, certiorari denied 273 U.S. 716, 47 S.Ct. 108, 71 L.Ed. 855; Cook et al. v. Illinois Bankers' Life Assn., 7 Cir., 46 F.2d 782, certiorari denied 284 U.S. 627, 52 S.Ct. 12, 76 L.Ed. 534.

In the McGarry v. Lentz case, the Sixth Circuit had up the exact question we have here, and were construing an Ohio statute identical in language. Since certiorari was denied in that case, and since it covers practically all of the legal questions presented here, I shall quote extensively only from that case. They held [13 F.2d 52]:

"Obviously, no state Legislature can regulate, limit, or control the jurisdiction of the federal courts, nor can the laws of any state preclude resort to the federal courts,

nor confer exclusive jurisdiction upon a designated state court, in a class of cases of which the federal courts of equity have theretofore been accustomed to assume jurisdiction. * * * On the other hand, that the state had the power to regulate the method of government, and to prescribe or limit the right of members to participate in the control, of a corporation of its own creation, cannot be doubted. The corporation being the mere creature of the law to which it owes its existence, it has very early been held 'to be capable of exerting its faculties only in the manner in which that act authorizes.' . * * * When the state has exercised this power of regulation prior to the time that an individual becomes a member of the society or corporation, the statutory provisions also become a part of the contract of membership and are controlling in the definition of the rights of the members. * * *

"In view of the quasi public nature of fraternal benefit societies, the undoubted power of control of the state over its own corporations, the assumption of general supervisory powers and control by the state, and the necessity of and reason for a centralization of management, protected from attack except in the general interest of all, as represented by the Attorney General, we conclude that this statutory provision is purely regulatory. Our reasons for this conclusion find support in numerous decisions. * * *

"Appellants in the present case, however, insist that the effect of giving this construction to section 9487 of the General Code of Ohio is the equivalent of conceding that the state Legislature may by statute curtail the jurisdiction of the federal courts of equity. This confuses the question of jurisdiction with that of the contract rights of the complainant. While the question is sometimes loosely referred to as one involving the jurisdiction of the court over the subject-matter of the litigation, the purpose, scope, and effect of section 9487 of the General Code of Ohio, and similar provisions in other states, are those of the limitation of the rights of members and policy holders, rather than a restriction upon the jurisdiction of courts of equity.

"In the present case the very contract, which created whatever rights the complainants may have, limited and defined those rights, so as to exclude the remedy now asserted. The question, therefore, is not whether the complainants are by statute precluded from asserting in this court a right given them by law, but rather whether the right was ever existent. The complainants have no rights here which do not originate under and are not founded upon their contracts of membership and policies of insurance in the American Insurance Union. The statutes of Ohio which were in force at the time such policies were issued are to be read into and considered as forming an integral part of such contracts. Under such statutory law and therefore by their own contracts, the complainants have expressly agreed that they will prosecute no application for injunction against this society, and, in effect, that the management of the affairs of the company shall not be made the subject of litigation, except by the action of the Attorney General of Ohio, nor the subject of controversy except in the method provided by statute, or by the by-laws of the corporation consistent with statute."

■ This suit was filed on the 12th day of January, 1943. All of the original plaintiffs alleging that their policies in The Praetorians were issued to them at different dates, all subsequent to the enactment of Articles 52 and 53. On the 4th day of February, 1943, one David A. Stovall, alleged to be a citizen of Oklahoma, asked leave of the Court to be made a party to this suit, alleging that his policy was issued to him in 1908, which was prior to the enactment of the Texas statutes here construed. Rule 24(b) and (c), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c control such an application. He had only a permissive right to intervene. Notice must be given to the parties of such an application to intervene as plaintiff. No such notice appears to have been given. Also it appears no order was entered granting leave to Mr. Stovall to intervene or to be made a party to the suit. Nevertheless the question is raised that, if the other plaintiffs are held to be incompetent, under Articles 52 and 53, to maintain this suit, that they have no application to the party Stovall, for the reason stated. Assume that he is a party plaintiff, his policy is not attached to his application, nor was it introduced in evidence. His contract with the Society might furnish a basis for this new question. It might provide that his policy was not only subject to existing laws, but to future laws that might affect his policy rights. This

subject was dealt with by Judge Pollock in Haynes v. Fraternal Aid Union, supra. He said [34 F.2d 306]:

"Does this statute foreclose the plaintiffs, all of whom are nonresidents of Kansas? It is axiomatic that the process of the federal courts cannot, in the ordinary instance, be regulated or curtailed by state statutes. If such could be done, the state could abolish federal courts altogether. The law is clear. * * * A fortiori, a policy holder of another state is not bound by statutes passed after his policy is issued; as a matter of fact, such after-enacted statutes do not affect the rights of resident policy holders, for they may impair the obligation of his contract. Priest v. Bankers Life, 99 Kan. 295, 161 P. 631.

"But we are not dealing with an ordinary contract of insurance made by an ordinary life insurance company. We are dealing here with a class of insurance in which the policy holders are both the insurer and the insured. Now it is clear that a man may make a contract agreeing not to apply for a receiver or an injunction, and may do this by a reference in his contract to existing statutes, whether they be statutes of his own state or of another. The state statute then limits the policy holders' rights, not by force of the statute (for the statute cannot impair the powers of the federal judiciary), but by force of his own contract. And his contract may incorporate by reference statutes or by-laws passed in the future. The plaintiffs' contracts are not attached to the bill, as they should be, but it is asserted, and not denied, that their contracts are subject to existing and future statutes and by-laws."

It is a general rule that an intervenor may merely follow the suit in which he has intervened; that he cannot maintain any such suit, with the original parties plaintiffs dismissed. That question has not been raised here or discussed. It is obvious that the party Stovall, even if he is a party or should become the lone plaintiff in the case, could not maintain this as a class suit in behalf of parties who were incompetent to bring it; that he could only maintain it as a class suit in behalf of those in his class, if any. Be that as it may, The Praetorians is a mutual fraternal benefit society. The applicant, Stovall, is an insurer, as well as insured. This question has not been briefed, but I believe he would be bound by any and all laws passed by the State of Texas, affecting his rights as a policy holder. This plea to the jurisdiction was filed before his application. Under the circumstances, assuming he is a party, the burden would be on him, by stipulation or evidence, to show facts that would differentiate his policy in its obligations from those of the other plaintiffs.

The plea will be sustained. An order may be drawn up accordingly.